Joseph B. SAMPLE

v.

Ernest E. DIECKS, S.R.O., S.C.I.PH., James Howard, Superintendent, S.C.I. PH., William B. Robinson, Commissioner of Corrections, Penna.

Appeal of Ernest E. DIECKS, S.R.O., and William B. Robinson, Commissioner of Corrections.

No. 88–3365.

United States Court of Appeals, Third Circuit.

Sept. 12, 1989.

Mark D. Shepard (argued), Buchanan Ingersoll, P.C., Pittsburgh, Pa., for appellee.

LeRoy S. Zimmerman, Atty. Gen., Donald P. Minahan (argued), Chief Deputy Atty. Gen., Chief, Western Regional Office, Gloria A. Tischuk, Deputy Atty. Gen., Gregory R. Neuhauser, Senior Deputy Atty. Gen., John G. Knorr, III, Chief Deputy Atty. Gen., Chief, Litigation Section, Pittsburgh, Pa., for appellants.

Before STAPLETON, SCIRICA and COWEN, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

This appeal raises interesting questions about the liability of prison officials under 42 U.S.C. § 1983 and the Constitution when a prisoner is held in jail beyond the term of his sentence.

On September 21, 1979, Joseph Sample was serving a life sentence for murder. On that date, the sentence was vacated and a new trial ordered by the Pennsylvania Supreme Court. Sample was granted bail pending the new trial, and his family was ready to post the required bail. The authorities detaining Sample in Philadelphia called Appellant Ernest Diecks, the senior records officer in the Pittsburgh Correctional Institution, to determine whether Sample could be released. Diecks informed them that Sample still had time to serve on another sentence. Accordingly, the Philadelphia authorities refused to set Sample free.

Diecks, however, was mistaken. As eventually determined by the Pennsylvania Bureau of Probation and Parole, Sample had already served his time on the other sentence. When Sample sent a copy of the Bureau's determination to Diecks, Diecks directed that Sample be set free—more

than nine months after his sentence should have been completed.

On June 17, 1981, Sample filed a damages suit under 42 U.S.C. § 1983 against Diecks and against appellant William Robinson, who was at that time the Commissioner of the Pennsylvania Bureau of Corrections. Sample claimed that, "[b]y unlawfully detaining and falsely imprisoning [him] for nine months and eight days longer than the five year maximum to which he was sentenced," Diecks and Robinson had deprived him of his constitutional rights under color of state law. ¶ 13, Amended Complaint; app. at 39–40.

Sample represented himself in a hearing on May 4, 1982 before Chief Magistrate Ila Jeanne Sensenich of the Western District of Pennsylvania, who was delegated the responsibility of hearing pretrial motions under 28 U.S.C. § 636(b)(1)(A) and holding an evidentiary hearing under 28 U.S.C. § 636(b)(1)(B). The magistrate determined that the factual issues were complex enough to require appointed counsel. Accordingly, Sample was represented by counsel at a second hearing, on August 4, 1986.

Magistrate Sensenich submitted proposed factual and legal findings in accordance with 28 U.S.C. § 636(b)(1)(C). Finding that Diecks had violated the eighth amendment's prohibition of cruel and unusual punishment by failing to take any meaningful action in response to Sample's complaint concerning his confinement beyond his release date, she recommended that judgment be entered for Sample on his claim against Diecks in the amount of $3,520. Regarding Sample's claim against Commissioner Robinson, the magistrate concluded that Robinson had violated Sample's right to procedural due process under the fourteenth amendment by "fail[ing] to establish a system by which [Sample] could effectively challenge the computation of his sentence...." App. at 182. Accordingly, she recommended that Robinson be held jointly and severally liable for the amount awarded to Sample on his claim against Diecks. The district court adopted the magistrate's proposed findings and recommendations in their entirety. We have jurisdiction to review the district court's final order under 28 U.S.C. § 1291.

## I.

Three of Sample's sentences are relevant to the issues raised in this appeal: a sentence imposed on a 1968 conviction for aggravated robbery; a sentence of probation and, upon its revocation, a term of imprisonment on a 1974 conviction for receiving stolen goods; and a life sentence in 1975 for murder. This simple enumeration, however, is somewhat complicated by Sample's parole and probation history.

In 1968, Sample was convicted of aggravated robbery. He was sentenced to two to six years, with the term of imprisonment commencing on December 24, 1968. Sample was paroled on December 28, 1970.

On September 27, 1972, Sample was arrested and charged with receiving stolen goods and other offenses. The Pennsylvania Board of Probation and Parole issued a "warrant to commit and retain" Sample for violating the terms of his parole from the 1968 sentence. In 1973, Sample was found guilty on the receiving-stolen-goods charge, but the conviction was vacated and a new trial ordered. On January 14, 1974, Sample pleaded guilty to the receiving-stolen-goods charge before Judge Albert Sabo of the Court of Common Pleas of Philadelphia County. Judge Sabo sentenced Sample to two years of probation.

Because of Sample's conviction for receiving stolen goods, the Pennsylvania Board of Probation and Parole determined that Sample had violated the terms of his parole on the 1968 conviction. The board formally revoked Sample's parole on January 21, 1974. But not long after that determination, on May 8, Sample was reparoled on his 1968 sentence.

On January 8, 1975—before his probation sentence had expired and while on parole for the second time from his 1968 sentence—Sample was arrested on a charge of murder and other offenses. On January 14, 1975, because of that arrest, the Board of Probation and Parole issued a warrant

to commit and retain Sample for allegedly violating the terms of his reparole on his 1968 sentence. But no further action was taken on this charge—no hearing was held and no revocation effected—before the Board of Probation and Parole closed the 1968 case in 1976. Meanwhile, also because of Sample's arrest for murder, on January 15, 1975, the probation department of the Philadelphia Court of Common Pleas placed a detainer against Sample for allegedly violating the terms of his probation sentence on the receiving-stolen-goods charge.

On December 15, 1975, Sample was convicted of murder. He was later sentenced to life imprisonment. He began serving his sentence at the Pennsylvania State Correctional Institution at Graterford.

On April 29, 1976, while he was serving time on his murder sentence, Sample was brought before Judge Sabo in Philadelphia. Judge Sabo revoked Sample's probation on the receiving-stolen-goods conviction and sentenced Sample as follows:

> Defendant sentenced to not less than two (2) years nor more than five (5) years at the S.C.I. at Graterford. Sentence to run consecutive to any sentence now serving. The sentence will take precedence over murder sentence.

App. at 102. Judge Sabo did not provide any more explicit indication of when the sentence was to commence. A status change report dated May 3, 1976 noted an effective commencement date of April 29, 1976, the date of Judge Sabo's sentence. Sample was returned to Graterford. In August 1978, Sample was transferred to the State Correctional Institution at Pittsburgh.

On September 21, 1979, Sample's murder conviction was overturned and a new trial ordered. Judge Ribner of the Court of

Common Pleas of Philadelphia County set bail for Sample on the murder charge on December 4. In January 1980, Sample's mother and a friend went to the Philadelphia Detention Center to post bond for Sample's release. The records supervisor of the Philadelphia Detention Center, Lieutenant Robert Lee, called appellant Diecks in Pittsburgh [1] to determine whether there were any detainers outstanding against Sample. Diecks told Lee that Sample had not served his full sentence on the receiving-stolen goods conviction.[2] After speaking with Diecks, Lee refused to release Sample.

Sample was imprisoned in Philadelphia until late April 1980. During this period he contacted his social worker about what he believed to be an illegal imprisonment, and he also contacted a lawyer named David Pollock. Pollock contacted Judge Sabo, apparently to no avail. Sample also contacted various correctional officers, who called Lieutenant Lee in Philadelphia on Sample's behalf to inquire about his continued imprisonment. According to Sample's testimony, these officers told Sample that Lee believed the problem was an outstanding detainer. Sample requested a copy of the detainer, but without success.

Sample was then transferred to the State Correctional Institution at Pittsburgh. The afternoon Sample was brought in—in late April 1980—he contacted Ernest Diecks and had a conversation with him at the prisoners' entrance to the jail. According to Diecks' testimony, Sample told Diecks his life sentence had been vacated and that he "should be out of jail." Diecks testified he then told Sample that Sample was "doing a two to five year sentence" and that he could not be released. Diecks further testified:

---

**1.** The State Correctional Institution at Pittsburgh was the last state institution in which Sample had been jailed. As such, it was the repository of a current set of Sample's sentencing records, and possibly of prior records from other state institutions. Diecks' testimony does not permit a definitive conclusion regarding exactly which files were available to him in Pittsburgh when Lieutenant Lee called.

**2.** The hearing record does not indicate exactly which information Diecks perused in arriving at his conclusion. Presumably, Diecks examined one of the sentence status summaries, otherwise known as a JBC 16C, which were part of Sample's Pittsburgh file. A summary indicates Sample's maximum on the receiving-stolen-goods sentence to have been April 29, 1981.

And I went as far as going over to the phone and called Judge Sabo's chambers due to the fact that if Mr. Sample had a legitimate beef, then I would hold the sheriffs there and have them take him right back to the Philadelphia Detention Center where he came from. I contacted Judge Sabo's chambers. And I don't know if I talked to the judge himself or one of his clerks, but the reply to me was that the judge sentenced Sample to a two to five year sentence, and it was out of his control. There was nothing he could do for it anymore, and that it would be a decision of the Pennsylvania Parole Board to release him.

App. at 500.

Diecks admitted that he did nothing further regarding Sample's case. He made no record of the conversation with Sample and did not refer Sample or his problem to anyone else.

Sample's account of his contact with Diecks varied somewhat from Diecks'. Sample testified, and the district court found, that he told Diecks that he was being held illegally because his sentence on the receiving-stolen-goods conviction had expired. Sample also testified that he had a subsequent conversation with Diecks, during which Sample told him that his receiving-stolen-goods sentence should have been adjusted back to January 15, 1975.

Sample then made numerous further efforts to make his problem known to various authorities. A letter written by Sample was forwarded by a state representative to Commissioner Robinson's office. That letter was apparently given to a subordinate of Commissioner Robinson. The magistrate found, and Sample does not dispute on appeal, that Robinson had no personal knowledge of Sample's complaint regarding the expiration of his sentence.

Sample also wrote a letter to William H. Moul, Director of the Division of Pre-release, Case and Record Management, Board of Probation and Parole. Moul—writing for the board and for its secretary—eventually answered Sample's query on August 22, 1980. Moul confirmed Sample's view that his continued imprisonment was incorrect. Moul wrote that, upon the vacating of the life sentence for murder, the receiving-stolen-goods sentence should have been readjusted to an effective date of January 15, 1975—the date the detainer was placed against Sample on his violation of probation. This would have meant a release date of January 15, 1980—as Sample believed—since the maximum sentence imposed by Judge Sabo on the receiving-stolen-goods conviction was five years.

Sample's saga was not over, however. Moul also wrote: "Although it is apparent that you are deserving of the credit back to 1-15-75 on your current 2 to 5 years sentence, our agency cannot specifically order that this time be applied as these two most recent sentences have never come directly under our supervision." Moul did not advise Sample regarding who exercised "supervision" over predicaments such as Sample's; instead, he told Sample he "hoped that the above information will be of assistance to you in obtaining this period of credit."

Sample did not send Moul's letter to Diecks, assuming instead that Diecks would have been sent a copy. After over a month passed without any word from Diecks, Sample mailed a copy of Moul's letter to Diecks on October 6, 1980. Diecks' response was swift. Notwithstanding his assertion at the second hearing that adjustment of sentences was purely a matter for the courts, two days after receiving Moul's letter, Diecks wrote to Lieutenant Lee in Philadelphia, where Sample was then being held, and directed him to release Sample. Sample was released on October 23, 1980, nine months and eight days after the expiration date of his sentence as determined by the district court, and nearly six months after Sample's conversation with Ernest Diecks.

II.

Appellants' initial position is that Sample had no right to be released until at least February 1981 and that the magistrate and district court were in error to conclude otherwise. Regardless of their respective roles in detaining Sample, Robinson and

Diecks urge that they cannot be held liable since Sample had no right to his freedom during the relevant period.

■ On the first day of the second hearing, Robinson and Diecks, in support of this conclusion, presented evidence to the magistrate purportedly demonstrating that, because Sample owed "backtime" on his 1968 conviction, he had no right to release until at least February 1981. This was the first occasion on which Robinson and Diecks had challenged the allegation in Sample's complaint that his prison term had expired on January 15, 1980, and the magistrate concluded that it would be unfair to Sample to permit this last-minute "amendment." We review the district court's adoption of the magistrate's recommendation on this issue for abuse of discretion.[3]

On September 26, 1985, over four years after Sample originally brought his action, the magistrate denied a motion of Robinson and Diecks for summary judgment. As authorized by Rule 56(d), the magistrate determined "what material facts exist[ed] without substantial controversy and what facts [were] actually and in good faith controverted." She found that "[i]t is undisputed that plaintiff was incarcerated for nine months and eight days after the expiration of his sentence for violation of probation." App. at 67. On the other hand, the magistrate determined that a genuine issue of material fact existed as to the states of mind of both defendants and as to whether and to what extent Commissioner Robinson owed any duty to Sample in the context of his prolonged detention. Neither Robinson nor Diecks thereafter challenged the magistrate's conclusion concerning the expiration of Sample's sentence.

Sample's pretrial narrative noted that "[d]efendants do not dispute the fact that, at the time of the [Pennsylvania] Supreme Court's reversal of Plaintiff's murder conviction, the effective date of Plaintiff's sentence for the probation violation should have been adjusted to January 15, 1975." App. at 82. Robinson and Diecks' pretrial narrative conceded that the effective date of the probation violation was "erroneously entered." App. at 96.

It was not until the first day of the second hearing, August 4, 1986—over five years after Sample had filed his complaint—that Robinson and Diecks informed the court that they wished to present the new defense that Sample's sentence had not in fact expired on January 15, 1980. The magistrate allowed Robinson and Diecks to present evidence supporting this theory, but at the close of the hearing, she ruled that defendants were estopped from presenting a theory at odds with the one embodied in the five years of pretrial proceedings, including the pleadings and both pretrial narratives. The district court adopted her recommendation.

■ It is well established that a trial judge possesses the discretion to prohibit parties from raising matters they have failed to advance during the pretrial proceedings. *See, e.g., Randolph County v. Alabama Power Co.,* 784 F.2d 1067, 1072 (11th Cir.1986), *cert. denied,* 479 U.S. 1032, 107 S.Ct. 878, 93 L.Ed.2d 833 (1987) (within trial judge's discretion to exclude from trial matters not raised in pretrial order); *Adalman v. Baker, Watts & Co.,* 807 F.2d 359, 369–70 (4th Cir.1986) (trial court's "broad discretion" not abused where court refused to allow witness to testify when witness was disclosed to opposing counsel only two

---

**3.** Robinson and Diecks objected to this portion of the magistrate's recommendation. Under Fed.R.Civ.P. 72(b) and 28 U.S.C. § 636(b)(1), the district court was required to engage in de novo review of that recommendation. Because of that de novo review, it follows that we should treat all issues raised by the district court's order according to the same standard we would apply had there been no recommendation by a magistrate. *Cf. LoConte v. Dugger,* 847 F.2d 745, 750 (11th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988) (magis-

trate's findings of fact adopted by district court become findings of the district court itself; court of appeals therefore applies "clearly erroneous" standard under Rule 52.); Fed.R.Civ.P. 52 (findings of a master, to the extent court adopts them, shall be considered as the findings of the court). We therefore apply the abuse-of-discretion standard in this context. *See De Laval Turbine, Inc. v. West India Inds.,* 502 F.2d 259 (3d Cir.1974) (applying "abuse of discretion" standard regarding failure to obey pretrial order).

days before trial). This is true regardless of whether a pretrial order under Rule 16 is entered by the judge. *Price v. Inland Oil Co.,* 646 F.2d 90, 96 (3d Cir.1981) (where no pretrial order issued, proper to consider whether pretrial proceedings narrowed issues for trial). In either situation, the purposes behind Rule 16 and the myriad local rules governing the narrowing of issues for trial, *see, e.g.,* Rule 5, Local Rules of the Western District of Pennsylvania (evidence not disclosed in pretrial narratives generally not admissible at trial), are served by vesting the trial judge with that discretion.

■ We find the district court's decision to be well within its discretion. The factual issues raised by the assertion that Sample's sentence had not expired on January 15, 1980 were complex and neither Robinson nor Diecks offered (or even offer on appeal) any reason why they were justified in not earlier advancing their new theory. We cannot say that the district court abused its discretion by refusing to reward this unexplained behavior—behavior the record indicates caught Sample's counsel as well as the magistrate by surprise.[4]

### III.

To recover on his § 1983 claim against Diecks, Sample must first show that Diecks acted under color of state law, a requirement conceded by Diecks. Diecks' arguments lie with two other requirements of § 1983: that a federally secured right be implicated and that the defendant deprived the plaintiff, or caused the plaintiff to be deprived, of that right. *See Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). Diecks contests the district court's factual findings that (1) his position as senior records keeper imposed upon him a duty to Sample to take steps regarding Sample's release date, (2) that Diecks failed to take those steps, (3) and that his failure caused the deprivation of which Sample complains—Sample's prolonged imprisonment. These findings are all essential to the district court's conclusion that Diecks is liable under § 1983. *See Leer v. Murphy,* 844 F.2d 628, 633 (9th Cir.1988). Before discussing these factual issues, however, we must first examine the legal issue of whether, if there was a deprivation, it was of a right secured by the Constitution, in this case by the "cruel and unusual punishment" clause of the eighth amendment.

### A.

Whether Sample's detention beyond the expiration of his term violated the eighth amendment requires us to consider wheth-

---

**4.** We also note that, even if the magistrate had considered appellants' theory, none of the evidence pointed to by appellants offers support for the proposition that Sample owed any backtime on his 1968 sentence at the time his murder sentence was imposed. Appellants' evidence consisted of two documents: the parole board's warrant to commit and retain Sample, issued on January 14, 1975, after the board learned of Sample's arrest for murder and other offenses, stating that the new maximum on the 1968 sentence expired on January 8, 1977; and a sentence status report indicating that the new maximum date on Sample's 1968 sentence was February 5, 1976. The validity of both of these maximum dates, however, depends on the imposition of backtime on the 1968 conviction. But backtime cannot be imposed without a formal revocation of parole by the parole board. Both the federal constitution and state law require a hearing and formal ruling before parole can be revoked and backtime thereby imposed. *Gagnon v. Scarpelli,* 411 U.S. 778, 786, 93 S.Ct. 1756, 1761, 36 L.Ed.2d 656 (1973); *Morrissey v. Brewer,* 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972); *Pennsylvania v. Vasquez,* 255 Pa.Super. 545, 389 A.2d 111, 113 (1978); 37 Pa.Code § 71.4(1) & (2) (revocation hearing must be held within 120 days after parole board receives notice of guilty verdict or plea). *See generally* Neil Cohen & James Gobert, *The Law of Probation & Parole* § 14.01 at 618–20 (1983). In Sample's case, no such revocation occurred. Sample was reparoled on his 1968 sentence on May 8, 1974. Although a warrant to commit and retain was issued against him on that charge when he was arrested for murder in January 14, 1975, no decision to recommit for violation of his reparole on the 1968 was made by the parole board, nor was Sample ever given a final hearing by the parole board regarding revocation of his reparole from the 1968 sentence. The 1968 case was closed in 1976. Even with consideration of this evidence, therefore, the correct date for Sample's release remains January 15, 1980—five years after the detainer was lodged against him for violating the terms of his probation on his receiving-stolen-goods conviction.

er that detention was "punishment" and, if so, whether it was "cruel and unusual." We conclude that it was both.

### 1.

█ We think there can be no doubt that imprisonment beyond one's term constitutes punishment within the meaning of the eighth amendment. *Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978) (confinement in prison or isolation cell is form of punishment under eighth amendment); *Haygood v. Younger,* 769 F.2d 1350, 1354 (9th Cir.1985) (en banc), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). Indeed, confinement in a prison pursuant to a conviction but beyond the term of a sentence seems to us to be quintessentially punitive. Here, for example, the state, through its official agents, intended to confine, did confine, and intended to continue to punish Sample throughout his confinement, including the unwarranted portion of it.

Admittedly, the unwarranted portion of Sample's incarceration was based upon an error: Had Diecks known that Sample's sentence was complete, the record suggests that Diecks would no longer have detained him. Although a mistaken basis for detention may have some bearing on whether that detention was "cruel and unusual," *see infra,* a mistaken basis for imprisonment does not alter the *punitive* nature of Sample's prolonged imprisonment. During the period of Sample's unwarranted detention, the state's avowed purpose for holding him was punitive; the relevant state actor believed he was carrying out the state's edict to punish Sample by detaining him. A subsequent determination that Sample should not have been detained—was improperly subjected to punishment—does not relate back to the relevant time period, thereby vitiating the state's intent during that time period.

### 2.

We now examine whether Sample's detention beyond term was "cruel and unusual." "Today the Eighth Amendment prohibits punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain,' *Gregg v. Georgia,* [428 U.S. 153, 183, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1976)], or are grossly disproportionate to the severity of the crime, *Coker v. Georgia,* 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977) (plurality opinion); *Weems v. United States,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910)." *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981) (footnote omitted). One class of "unnecessary and wanton" wrongs, and the one most relevant here, is those wrongs " 'totally without penological justification.' " *Id.* at 346, 101 S.Ct. at 2398 (quoting *Gregg,* 428 U.S. at 183, 96 S.Ct. at 2909).

There are two relevant senses in which a punishment may be penologically justified. The obvious one is where the state intends to impose the challenged harm to fulfill the retributive or deterrent functions of punishment. In Sample's case, if the concatenation of sentencing pronouncements and parole board determinations meant that he should have been released on January 15, 1980, then the state had acknowledged through those determinations that any deterrent and retributive purposes served by his time in jail were fulfilled as of that date. In this sense, his continued incarceration beyond the term established by the state was not penologically justified.

█ A harm could be thought of as penologically justified in another sense, however. The administration of a system of punishment entails an unavoidable risk of error. In the case of punishment through imprisonment, those errors may result in harms to inmates. Elimination of the risk of error in many instances would be either literally impossible or unfeasible because prohibitively costly. Thus unforeseeable accidents or inadvertent mistakes may occur during imprisonment, resulting in harms to inmates. Such accidents or mistakes are a necessary cost of any prison system; they therefore are not "repugnant to the conscience of mankind," *Estelle v. Gamble,* 429 U.S. 97, 105, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (quoting *Palko v.*

*Connecticut,* 302 U.S. 319, 323, 58 S.Ct. 149, 150, 82 L.Ed. 288 (1937)); *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986), and do not violate the eighth amendment.

The degree to which a harm is "unnecessary" in the sense of being unjustified by the exigencies of prison administration will affect the state-of-mind requirement a plaintiff must meet to demonstrate that a particular prison official violated the eighth amendment. For example, in *Whitley, supra,* the Court examined the appropriate standard for suits claiming eighth-amendment violations against prison officials acting to quell prison riots. The Court found that the need to restore order during a prison riot requires a high level of deference from the judiciary, not unlike the deference accorded the military. Those measures must often be taken in great haste and under extreme pressure—without the benefit of careful planning. Subjecting prison officials in such situations to suits predicated only on an absence of due care, or even on the presence of deliberate indifference would result in second-guessing that would have deleterious effects on the necessarily broad ambit of discretion prison officials need in such emergencies. Because such discretion is necessary to the administration of prisons, an official acting in good faith within that discretion, although in the process perhaps injuring an inmate, has not inflicted a cruel and unusual punishment upon that inmate.

■ Less deference, and hence a more lenient state-of-mind requirement from a prisoner-plaintiff's point of view, is required with respect to the providing of medical care to inmates. *See Estelle,* 429 U.S. at 103–04, 97 S.Ct. at 290–91. Providing medical care does not usually result in a clash with administration of prisons, *Whitley,* 475 U.S. at 320, 106 S.Ct. at 1084; the harms resulting from a failure to provide medical care are not necessary costs of administering a system of detention. On the other hand, characterizing common-law negligence in the medical context as cruel and unusual runs contrary to the spirit and history of the eighth amendment.

Simple malpractice under a common-law negligence standard, without some more culpable state of mind, is not inconsistent with evolving notions of decency merely because it occurs within the four walls of a prison. *See Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 291–92; *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). But where prison officials or doctors act with deliberate indifference to the serious medical needs of prisoners, they have unnecessarily and wantonly inflicted pain on inmates, thereby violating the eighth amendment. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291.

With this background, we turn to the eighth-amendment issue raised in Sample's case. Detention for a significant period beyond the term of one's sentence inflicts a harm of a magnitude similar to that involved in *Estelle.* Next to bodily security, freedom of choice and movement has the highest place in the spectrum of values recognized by our Constitution. As to the costs to the prison system of imposing liability, we think the concerns operative in *Whitley* are not present here. Considering an inmate's inquiry regarding the term of his sentence does not present the risks of danger to other inmates posed in *Whitley.* Where an official with a duty to investigate, check, or report is notified of a problem, the cost of his either rectifying the problem himself or reporting the problem to higher authorities will not compete with other aspects of administering the penal system. Any effect on prison administration that liability under the eighth amendment imposes by requiring speedy resolution of problems such as Sample's will be slight.

■ Accordingly, we reject as inappropriate in this context the good-faith standard imposed in *Whitley.* A prisoner held beyond his term need not demonstrate that a prison official's role in the prisoner's unwarranted detention amounted to a "knowing willingness" that the unjustified detention would occur, *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085, or that he or she acted "maliciously and sadistically for the very purpose of causing harm," *id.* (quot-

ing *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)). We believe the situation presented by Sample's case is more analogous to the one confronted by the Supreme Court in *Estelle.* Accordingly, we hold that there can be no eighth amendment liability in this context in the absence of a showing of deliberate indifference on the part of the defendant to whether the plaintiff suffers an unjustified deprivation of his liberty. In holding that the eighth amendment is violated when deliberate indifference is exhibited in this context, our views are in harmony with those expressed by the Court of Appeals for the Ninth Circuit sitting en banc—the only other federal appellate court to have considered this issue. *Haygood v. Younger,* 769 F.2d 1350, 1354–55 (9th Cir.1985).

■■■ To establish § 1983 liability in this context, a plaintiff must first demonstrate that a prison official had knowledge of the prisoner's problem and thus of the risk that unwarranted punishment was being, or would be, inflicted. Second, the plaintiff must show that the official either failed to act or took only ineffectual action under circumstances indicating that his or her response to the problem was a product of deliberate indifference to the prisoner's plight. Finally, the plaintiff must demonstrate a causal connection between the official's response to the problem and the infliction of the unjustified detention.

■■■■ Among the circumstances relevant to a determination of whether the requisite attitude was present are the scope of the official's duties and the role he or she has played in the everyday life of the prison. Obviously, not every official who is aware of a problem exhibits indifference by failing to resolve it. A warden, for example, although he may have ultimate responsibility for seeing that prisoners are released when their sentences are served, does not exhibit deliberate indifference by failing to address a sentence calculation problem brought to his attention when there are procedures in place calling for others to pursue the matter. On the other hand, if a prison official knows that, given his or her job description or the role he or she has assumed in the administration of the prison, a sentence calculation problem will not likely be resolved unless he or she addresses it or refers it to others, it is far more likely that the requisite attitude will be present.

### B.

■■■ We now must determine whether the record supports the district court's determination that Diecks was the cause of Sample's prolonged detention because of his deliberate indifference to Sample's predicament. The magistrate concluded that Diecks, as senior records officer, had the responsibility to review inmates' sentencing status and the authority to direct the release of inmates whose time had been served. These findings are amply supported by the record.

Diecks' job description, as described by Diecks himself in an official prison report, provided that, as a "Corrections Records Specialist III," he "supervise[d] and plan[ned] the development and maintenance of records containing inmates' criminal histories and identification dossiers." App. at 704. As part of his job, he computed inmates' sentences and "review[ed] the computation of inmates' sentence status for presentation for parole consideration or discharge at the expiration of the maximum sentence." *Id.* Diecks also was expected to "interview inmates personally who request hearings and advice on non-technical problems pertaining to their sentence status governing their term within the institution...." *Id.*

The record also indicates that inmates and officials understood Diecks to be the one initially responsible for interpreting the records to determine when an inmate should be released. Thus it was that Lieutenant Lee in Philadelphia called Diecks, and relied upon Diecks' assertion that Sample should not be released. And it was also Diecks who ultimately did direct that Sample be released nine months later. Moreover, Diecks acknowledged at the hearing that he believed his investigation was the only avenue available to an inmate challenging detention and this was confirmed

by the fact that Diecks did not refer Sample to anyone else in a position to resolve the problem. Diecks, in other words, believed Sample had to rely on him alone for help.

Diecks also admitted at the hearing that Sample's case was a bona fide problem— one that Diecks acknowledged deserved treatment as a "rush" inquiry under the prison's own regulations. Diecks' recognition that Sample's contention concerning the expiration of his sentence had possible merit was also indicated by the fact that Diecks attempted to contact Judge Sabo— the judge who sentenced Sample for his violation of probation. Diecks called Judge Sabo's chambers, but spoke only with a secretary or law clerk who, according to Diecks, told him the matter was "out of [the judge's] hands" and for the parole board. At the hearing, Diecks indicated that this was indeed a correct assessment of the situation. It thus appears that Diecks either contacted the judge while knowing that such contact would be futile, or realized the same after his conversation with the person in the judge's chambers. Nevertheless, Diecks took no further action.

There was also extensive uncontradicted testimony at the hearing that Diecks did not comply with, and even took action prohibited by, Pennsylvania Department of Justice Sentence Status Procedures (OM–9) governing "[s]tandard procedures involving common sentence status problems." App. at 666. Diecks did not dispute that these procedures were applicable to the situation that arose in Sample's case. Those regulations provided that, in situations like Sample's, Diecks was required promptly to route detention inquiries to the attorney general's office and to set up a "tickler" file on the problem to ensure that it not go unaddressed. In Sample's case, Diecks did not make a record or "tickler" file of Sample's complaint or of his conversation with Judge Sabo's chambers, and he did not forward Sample's inquiry to anyone. His sole act in response to Sample's inquiry was to contact Judge Sabo, an act in fact prohibited by the regulations.

In sum, the record demonstrates that Diecks (1) believed Sample's inquiry might well have merit, (2) knew that the matter needed to be clarified, (3) believed Sample had to rely on his (Diecks') efforts alone to rectify the problem, (4) did not follow the relevant procedures mandated by the Pennsylvania Bureau of Correction, (5) took no other remedial action, and (6) did not inform Sample of any other action he (Sample) might take to resolve his problem. Given these facts, we are unable to say that the district court erred in finding that Diecks was deliberately indifferent to the known and substantial risk that Sample was being subjected to cruel and inhumane treatment.

Diecks raises one final issue concerning whether he possessed the power or duty to adjust Sample's sentence when Sample's murder conviction was vacated—an argument that pertains to the causation inquiry under § 1983. The testimony on this issue was contradictory and confused. The OM–9 regulations seemed to indicate that, upon the vacating of one sentence, another, concurrent sentence should be adjusted back to the first date of confinement or, in the case of a detainer, the date the detainer was lodged against the inmate. *See also Pennsylvania ex rel. Thor v. Ashe*, 138 Pa.Super. 222, 11 A.2d 173 (1940) (cited in the OM–9 prison regulations; granting credit back to date of incarceration). Moreover, the regulations clearly indicated that a records officer could give an inmate commitment credit. Ex–Commissioner Robinson's testimony also supported the view that credit should be granted in the case of a concurrent sentence.

On the other hand, Diecks maintained several times that he required court approval to adjust a sentence. Yet the credibility of this position was undermined by Diecks' act of releasing Sample upon hearing from the parole board, as well as by the OM–9 regulations. And Diecks also seemed to confirm in his testimony the power of the parole board to adjust Sample's sentence.

Diecks also maintained that Judge Sabo's sentence was consecutive, not concurrent.

The sentence itself was contradictory, using the word "consecutive," yet indicating that the sentence would "take precedence" over the murder sentence, thereby suggesting that Sample would serve the stolen-goods sentence first, despite the fact that he had already begun serving his murder sentence. To confuse matters further, a sentence status report described the sentence as "cc underlapping," "cc" standing for concurrent. App. at 716.

Fortunately, we need not resolve these contradictory positions. We have upheld the magistrate's determination that Sample's sentence expired on January 15, 1980. Whether Diecks was the proper person to grant credit is not the point. It is not disputed that Diecks had the duty, believed he had the duty, and was understood by prisoners to have the duty expeditiously to unravel sentencing problems such as Sample's, as well as the authority to release inmates when his interpretation of their records indicated release to be appropriate. It is also not disputed that, with his access to all of the relevant inmate records and with his training in how to decipher them, Diecks was in the best position either to solve the problem himself or to know who could. If Diecks had referred the matter to the Attorney General's office after his conversation in April with Sample, it is likely that Sample would have been released in a matter of days. Instead, because of Diecks' deliberate indifference, Sample's release was delayed nearly six months after his conversation with Diecks, the only period for which he was awarded damages. The district court thus did not err in finding a causal connection between Diecks' conduct and Sample's injury.

### C.

Diecks and Robinson both complain about the district court's conclusion that Sample should be awarded twenty dollars for each day of confinement after the time Sample would have been released if Diecks had fulfilled his duty to Sample (on May 1, 1980 according to the magistrate). They contend that this conclusion was "without evidentiary basis" and "based wholly on

the abstract value of a constitutional right," Br. of Appellants at 44, relying on *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986), as support for this argument.

*Stachura* is irrelevant in this context. In *Stachura*, the Court held that a jury should not be charged that, in *addition* to damages compensating the plaintiff for the harm suffered, it can award damages in relation to the "importance" of the constitutional right infringed. The Court's objection to such an award was that it would allow damage awards abstracted from any notion of actual harm to the plaintiff, tethered only by the "jury's subjective perception of the importance of constitutional rights as an abstract matter." 477 U.S. at 308, 106 S.Ct. at 2543.

In Sample's case, the magistrate based her modest award of twenty dollars per day on an approximation of the value of a day of freedom. Surely, if we required an accountant's methodology to be applied in such matters, no price could be fixed and constitutional wrongs would go uncompensated entirely, as well as undeterred. The district court did not abuse its discretion in adopting the magistrate's figure. *See Mack v. Johnson*, 430 F.Supp. 1139, 1151 (E.D.Pa.1977), *aff'd*, 582 F.2d 1275 (3d Cir.1978).

### IV.

### A.

We turn next to Sample's claim against Robinson. Robinson first argues that Sample's suit against him is barred by the eleventh amendment. When state officials are sued in their individual capacity, the eleventh amendment does not bar damage suits against them for deprivations of federal rights caused by those officials under color of state law. *Scheuer v. Rhodes*, 416 U.S. 232, 238, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974); *Ex parte Young*, 209 U.S. 123, 159–60, 28 S.Ct. 441, 453–54, 52 L.Ed. 714 (1908). A suit nominally against an individual official, however, may nevertheless be viewed as one against the state

if the suit seeks damages from the state treasury. *See Kentucky v. Graham,* 473 U.S. 159, 165–66 & n. 11, 105 S.Ct. 3099, 3104–05 & n. 11, 87 L.Ed.2d 114 (1985); *Brandon v. Holt,* 469 U.S. 464, 470–71 & n. 18, 105 S.Ct. 873, 877 & n. 18, 83 L.Ed.2d 878 (1985); *Harris v. Pernsley,* 755 F.2d 338, 343 (3d Cir.1985).

▇ Robinson makes no claim that this suit seeks or will result in damages from the state. Nor does Robinson charge that he is merely a nominal party. Indeed, such an assertion would border on the frivolous: Robinson stepped down as commissioner in June 1980, eight years before Sample prevailed in the district court, and he, not the succeeding commissioner, remained the defendant from whom relief was sought. Sample seeks damages from Robinson alone, not from the state treasury. The eleventh amendment accordingly provides no shield in this case. We therefore consider whether the district court erred in concluding that Robinson could be found liable under the fourteenth amendment's due process clause.

### B.

Under § 1983, every person who, acting under color of state law, "subjects or causes to be subjected" another person to a deprivation of a federally secured right is liable for that transgression. As the Supreme Court noted in *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 691–92, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), the above-quoted phrase from § 1983 indicates that there are two ways one can be liable under this statute. One can be liable for one's own constitutional tort, that is, for "subjecting" the plaintiff to the constitutional violation. Or one can be liable, under appropriate circumstances, for someone else's constitutional tort, that is, for "causing" the plaintiff to be subjected to the constitutional violation.

In this case, the district court approved the magistrate's conclusion that ex-Commissioner Robinson had deprived Sample of liberty without due process of law by "failing to establish a system by which a prisoner who believed that his sentence had ex-pired could promptly obtain a fair and accurate determination." App. at 182. Read literally, this suggests that the district court found Robinson liable for his own constitutional tort—for breaching a constitutional duty owed to Sample "to establish a system." On this record, however, this literal reading is problematic. It is undisputed that Robinson's department had a set of written procedures in place and, indeed, the district court concluded that Diecks had a duty under those procedures to hear and to refer or dispose of claims like Sample's. Moreover, we do not understand Sample to contend that these written procedures, at least if correctly interpreted, did not comport with due process. Rather, Sample advances two theories in support of his judgment against Robinson. First, he asserts that although Robinson had a written set of procedures in place, these had been displaced by an approved "custom and practice" that did not comport with due process. This theory would hold Robinson liable for his own constitutional tort, that is, for approving the defective process. Second, Sample argues that Robinson failed to enforce the written procedures and that Sample's claim did not receive meaningful consideration because of that failure. This theory would hold Robinson liable for Diecks' constitutional tort. These two theories are analytically distinct and we address each in turn. We conclude that in neither instance are the findings of the district court adequate to support the judgment entered against Robinson.

### 1.

▇ A plaintiff, like Sample, who brings a § 1983 suit based on a violation of the due process clause must allege and prove five things: (1) that he was deprived of a protected liberty or property interest; (2) that this deprivation was without due process; (3) that the defendant subjected the plaintiff, or caused the plaintiff to be subjected to, this deprivation without due process; (4) that the defendant was acting under color of state law; and (5) that the plaintiff suffered injury as a result of the deprivation without due process. Robinson

acknowledges that at all relevant times he was acting under color of state law.

 Under the fourteenth amendment, a state may not authorize the deprivation of a protected liberty or property interest without providing a procedure in connection with that deprivation that meets the requirements of due process. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). Thus, when a policy-making official establishes a constitutionally inadequate state procedure for depriving people of a protected interest and someone is thereafter deprived of such an interest, the official has "subjected" that person to a due process violation. *Stana v. School Dist. of City of Pittsburgh*, 775 F.2d 122, 130 (3d Cir.1985); *Berlanti v. Bodman*, 780 F.2d 296, 300–01 (3d Cir.1985). *See also Weimer v. Amen*, 870 F.2d 1400, 1404 (8th Cir.1989) (acknowledging in dicta that if official has authority over relevant procedural system, his action or inaction can constitute "established state procedure" and the official can be held liable); *Matthiessen v. N. Chicago Community High School Dist. 123*, 857 F.2d 404, 407 n. 3 (7th Cir.1988) (single act of sufficiently high-ranking policymaker may constitute established state procedure).

 When an official authorizes constitutionally inadequate procedures, the official's liability is not negated by a showing that he or she did not intend to deprive the plaintiff of due process of law. Any state-of-mind requirement of the due process clause, *see Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Davidson v. O'Lone*, 752 F.2d 817 (3d Cir. 1984) (in banc), *aff'd sub nom. Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), is satisfied if the official authorizes a system with the intention that it will operate to deprive persons of life, liberty, or property, whether or not he intends the deprivation to be without due process of law. As we said in *Sourbeer v. Robinson*, 791 F.2d 1094, 1105 (3d Cir. 1986), "We know of no authority for the proposition that an intentional deprivation of life, liberty or property does not give rise to a due process violation because the failure to provide due process was without fault." *See also Davidson*, 752 F.2d at 828 (plaintiff states due process claim under § 1983 where he alleges prison officials infringed liberty interest by establishing an unconstitutional state procedure); *Colburn v. Upper Darby Township*, 838 F.2d 663, 668 (3d Cir.1988) (same).

 Turning to this case, we start with the proposition, undisputed by Robinson, that Sample had a liberty interest claim, recognized by state and federal law, to release on January 15, 1980. Under the fourteenth amendment, the state could not deprive him of this liberty interest claim without procedural due process. Moreover, Robinson knew that liberty interest claims of this kind arose in the prisons under his jurisdiction and he authorized records officers to dispose of those claims. Put another way, he intentionally authorized records officers deliberately to dispose of liberty interest claims. Accordingly, Robinson can be said to have deprived Sample of his liberty interest claim without due process of law if (1) the process Sample received in connection with the rejection of his claims was constitutionally inadequate, (2) Robinson authorized that constitutionally inadequate process, and (3) the process authorized by Robinson caused Sample's prolonged imprisonment.

Sample does not argue that the written procedures governing the disposition of challenges to institutionally established release dates do not comport with due process. Briefly, the record evidence shows that records officers were charged with the responsibility of hearing prisoner challenges to the computation of their release date. It further shows that regulation OM–9 advised records officers to refer "questionable sentences" to the deputy attorney general through the Department of Corrections and to maintain "tickler files" on such complaints to make sure that they

received attention. A grievance procedure was in place that allowed inmates to file complaints if they were dissatisfied with the response they received from a records officer, and prisoners had access to the warden by this means. Finally, inmates who disagreed with the computation of their sentence were entitled to judicial review in the Commonwealth Court and in the Court of Common Pleas. *See* 42 Pa. Cons.Stat.Ann. § 763(a) (appeal of administrative decisions to Commonwealth Court); *Davis v. Cuyler,* 38 Pa.Cmwlth. 488, 394 A.2d 647, 648 (1978) (hearing appeal of computation of sentence by Board of Probation and Parole); *Commonwealth v. Isabell,* 503 Pa. 2, 467 A.2d 1287, 1291 (1983) (When prisoner claims misinterpretation of sentence by Bureau of Corrections, relief should be sought through habeas corpus petition in Court of Common Pleas.).

While not challenging the written procedures, Sample urges that custom and practice in the department or at his institution (which of the two Sample does not make clear) differed from the procedures specified in the regulations and that this custom and practice deprived him of his liberty interest without due process of law. Given the district court's reliance on *Sourbeer,* 791 F.2d at 1101 (holding that certain prison procedures were facially adequate but applied in a "rote" fashion that deprived Sourbeer of a "meaningful opportunity to be heard"), it appears that the district court agreed.

■ Sample emphasizes Robinson's testimony that the records officers were permitted to and did exercise discretion in applying the written regulations. In the absence of any evidence that Diecks was not qualified to make decisions about which claims were sufficiently colorable to warrant referral to the Attorney General's Office, we perceive no procedural due process problem here. Delegating decisionmaking authority and discretion in exercising that authority is not in and of itself indicative of constitutionally inadequate process. There are times, in fact, where delegation of discretion is imperative to the functioning of

an efficient and fair system, whether in the prisons or elsewhere. As we hereafter conclude, procedural due process requires that an inmate with a challenge to the calculation of his release date promptly be listened to by someone having authority to decide the challenge or pass it on for further review and decision; due process does not, however, require that records officers refer every argument made by an inmate, regardless of its plausibility, to a deputy attorney general. The cost of such a requirement would far outweigh its marginal utility in reducing the risk of overstays. *See Mathews v. Eldridge,* 424 U.S. 319, 348, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976). Thus, the fact that Robinson gave his blessing to a system in which records officers exercised discretion on both whether to grant relief and whether to refer does not alone provide a basis for liability.

Sample also emphasizes, however, that his liberty interest claim received no meaningful consideration by Diecks before it was rejected and that Diecks had *never* referred a complaint about a release date to the Attorney General's Office. Sample thus appears to argue that the system denied him a meaningful predeprivation opportunity to have his claim heard and considered because records officers, as a matter of custom and practice, did not exercise their discretion in a meaningful way. *Compare Sourbeer,* 791 F.2d at 1101.

■ Applying the three-part weighing analysis of *Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903, we are constrained to agree with Sample that due process entitled him to an opportunity to have his claim to a January 15, 1980 release date meaningfully and expeditiously considered. His interest in avoiding wrongful detention was obviously a strong one. The risk of error in calculating a release date, as Sample's case demonstrates, is both substantial and one that can be materially reduced by the simple expedient adopted in regulation OM-9—authorizing records officers promptly to hear[5] the inmate's "side of the story" and promptly to refer doubtful is-

---

**5.** This case does not call for us to determine whether the inmate must be "heard" in person.

sues to someone trained in the law and with authority to resolve the controversy. The additional administrative burden from this expedient appears modest and is substantially outweighed by its utility in reducing the risk of overstays.

 We also agree with Sample that this record will not support a finding that the judicial remedies provided by the Commonwealth were alone sufficient to meet the requirements of due process. The foregoing *Mathews v. Eldridge* analysis dictates that to the extent possible the inmate be afforded predeprivation process. Sample could not have asserted his claim prior to January 15, 1980. Every day after that date Sample faced the prospect of a fresh deprivation of his liberty. Assuming, as we do in the absence of evidence to the contrary, that the judicial remedies available in a situation of this kind would consume more time than the administrative process specified in OM–9, we conclude that that administrative process was required by the due process clause in a case of this kind.

Nevertheless, we stress that Robinson cannot be held liable on this theory unless he is responsible for establishing or maintaining a state process that does not comport with due process. Although it is appropriate in this context to inquire whether custom and practice has displaced the *de jure* system, custom and practice can provide a basis for liability under this theory only if the official can realistically be said to have approved the displacement of the *de jure* system with whatever the offending custom or practice is found to be. Although that approval need not be expressly articulated, in order for the official to be held responsible for an "established state procedure" his or her conduct must in some manner communicate approval of that procedure to others.

 The district court found that Sample's complaint did not receive meaningful consideration—was in effect ignored—by the relevant records officer. It did not find that Robinson was aware that the prevailing custom and practice was for records officers to ignore such complaints or that

he approved the displacing by that practice of the procedures articulated in OM–9 for considering complaints. In the absence of such findings, the judgment of the district court against Robinson cannot be sustained on this theory.

 To summarize, a state policymaker can be liable for a violation of due process if she or he establishes a state process that will deprive inmates of a liberty interest without requiring a concomitant procedure that comports with the requirements of the fourteenth amendment. The official may be held liable without a showing that he or she intended to deprive inmates of due process or was deliberately indifferent to the risk that inmates would be so deprived; an intent that the process will result in a deprivation of protected interests will suffice. But such liability is predicated on the official's responsibility for a state process that deprives without adequate procedural safeguards. Where as here, there is a *de jure* system that comports with due process and the contention is that there was an established state custom and practice that did not, the plaintiff must prove that for some reason the official decided to approve the displacement of the *de jure* system with the conflicting custom and practice of which the plaintiff complains.

### 2. Robinson's Alleged Responsibility for *Diecks' Constitutional Tort*

As we have noted, Sample argues in the alternative that Robinson failed to enforce the written procedures and that his failure resulted in Sample's overstay. This argument focuses not on what system Robinson established, but on the adequacy of his supervision of the prison system. We think the rubric "supervision" entails, among other things, training, defining expected performance by promulgating rules or otherwise, monitoring adherence to performance standards, and responding to unacceptable performance whether through individualized discipline or further rulemaking. For the purpose of defining the standard for liability of a supervisor under § 1983, the characterization of a particular aspect of supervision is unimportant. Su-

pervisory liability in this context presents the question whether Robinson was responsible for—whether he was the "moving force [behind]," *City of Canton v. Harris,* —— U.S. ——, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989) (quoting *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978))—Diecks' constitutional tort.[6]

In *City of Canton v. Harris*—a case that had not yet been decided at the time of the proceedings in the district court—the Court considered the standard for liability for an official's failure to train, an aspect of supervision. In particular, the Court first rejected the municipality's argument that it could be held liable only if its policy regarding training itself violated the Constitution. The Court recognized that in some circumstances such a policy, not itself unconstitutional, could give rise to § 1983 liability when causally related to a constitutional tort of a municipal employee. In describing those circumstances, the court first addressed the *"degree of fault* that must be evidenced by a municipality's inaction before liability is permitted." It held that a municipality may be held liable for a failure to train public employees that results in a constitutional violation "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the constitutional rights of its inhabitants." 109 S.Ct. at 1206. The Court further observed that liability may be imposed where the risk of constitutional violations is so great and obvious that deliberate indifference can be inferred from that risk and the city's failure to address it through appropriate training. "[T]he need to train officers in the constitutional limitations on the use of deadly force, [for example] may be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."

*Id.* at 1205 n. 10. The Court also noted that where the risk is not obvious from the nature of the activity, the existence of a pattern of constitutional violations may provide a basis for implying deliberate indifference on the part of city policymakers to the need for training in a particular area.

The Court went on to caution, however, that "for liability to attach ... the identified deficiency in a city's training program must be closely related to the ultimate injury." *Id.* at 1206. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city." Thus, in the factual setting of *City of Canton,* the Court stressed that the plaintiff "must still prove that the deficiency in training actually caused the police officer's indifference to her medical needs." *Id.*

Finally, the Court emphasized:

To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. See *Oklahoma City v. Tuttle,* [471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985)]. Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities—a result we rejected in *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 693, 694, 98 S.Ct. 2018, 2037, 2037–38, 56 L.Ed.2d 611 (1978)]....

*Id.*

 Although the issue here is one of individual liability rather than of the liabili-

---

**6.** In *Haygood v. Younger,* 769 F.2d 1350, 1355–58 (9th Cir.1985) (en banc) the court concluded that records officers similarly situated to Diecks violated the inmate's right to due process of law as well as his right to be free from cruel and unusual punishment. The district court in this case found it unnecessary to reach that due process issue, as do we. The district court found that Diecks' handling of Sample's liberty interest claim violated the Eighth Amendment and we have upheld that conclusion. Robinson's responsibility for that conduct depends on the same criteria, i.e., those articulated in *City of Canton,* without regard to how one categorizes Diecks' constitutional tort.

ty of a political subdivision, we are confident that, absent official immunity,[7] the standard of individual liability for supervisory public officials will be found to be no less stringent than the standard of liability for the public entities that they serve. In either case, a "person" is not the "moving force [behind] the constitutional violation" of a subordinate, *City of Canton,* 109 S.Ct. at 1205, unless that "person"—whether a natural one or a municipality—has exhibited deliberate indifference to the plight of the person deprived. *See Lipsett v. University of Puerto Rico,* 864 F.2d 881, 902 (1st Cir.1988).

■ Based on *City of Canton,* we conclude that a judgment could not properly be entered against Robinson in this case based on supervisory liability absent an identification by Sample of a specific supervisory practice or procedure that Robinson failed to employ and specific findings by the district court that (1) the existing custom and practice without that specific practice or procedure created an unreasonable risk of prison overstays, (2) Robinson was aware that this unreasonable risk existed, (3) Robinson was indifferent to that risk, and (4) Diecks' failure to assure that Sample's complaint received meaningful consideration resulted from Robinson's failure to employ that supervisory practice or procedure. Sample has not made such an identification. The district court may have made the first of these findings implicitly; it clearly did not make the last three. Accordingly, the judgment against Robinson cannot be sustained on this theory and we will remand for further consideration in light of the governing principles identified in this opinion. Given that neither the parties nor the court had the benefit of *City of Canton* when this case was originally tried, the district court may wish to take, or have the magistrate take, further evidence. We leave that to the discretion of the district court, however.

On remand, the district court should bear in mind that under the teachings of *City of Canton* it is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did. The district court must insist that Sample identify specifically what it is that Robinson failed to do that evidences his deliberate indifference. Only in the context of a specific defalcation on the part of the supervisory official can the court assess whether the official's conduct evidenced deliberate indifference and whether there is a close causal relationship between the "identified deficiency" and the "ultimate injury."

■ Normally, an unreasonable risk in a supervisory liability case will be shown by evidence that such harm has in fact occurred on numerous occasions. Similarly, deliberate indifference to a known risk will ordinarily be demonstrated by evidence that the supervisory official failed to respond appropriately in the face of an awareness of a pattern of such injuries. The present record in this case does not affirmatively show a pattern of injuries similar to Sample's and there is no indication that Robinson was aware of any such incident. *City of Canton* indicates that this absence of prior incidents and knowledge thereof is not necessarily fatal to Sample's case. As we have noted, that case observed that there are situations in which the risk of constitutionally cognizable harm is so great and so obvious that the risk and the failure of supervisory officials to respond will alone support findings of the existence of an unreasonable risk, of knowledge of that unreasonable risk, and of indifference to it. Nevertheless, in the absence of a pattern of constitutionally cognizable injuries, it becomes particularly important for a trial court finding for the plaintiff to explain the basis for its inference in the plaintiff's favor on all three of these issues.

### V.

We conclude that the district court did not err in finding that Senior Records Offi-

---

**7.** One of the grounds of Appellants' motion to dismiss, filed on September 7, 1983, was qualified immunity. The motion was denied on Oc-

tober 13, 1983, and Appellants have not appealed the qualified immunity decision of the district court.

cer Diecks violated Sample's constitutional right to be free of cruel and unusual punishment. We further conclude, however, that the district court's limited findings will not support the judgment entered against ex-Commissioner Robinson. Accordingly, we will affirm the district court's judgment against Diecks, reverse its judgment against Robinson, and remand for further proceedings consistent with this opinion.