Alfred I. MILLER, Plaintiff,

v.

CORRECTIONAL MEDICAL SYSTEMS, INC., ARA Medical Services, Inc. d/b/a Correctional Medical Systems, Benjamin Robinson, M.D., Robert J. Watson, Henry Risley, and Walter Redman, Defendants.

Civ. A. No. 91–506–JLL.

United States District Court,
D. Delaware.

Aug. 28, 1992.

---

Jeffrey S. Goddess of Rosenthal, Monhait, Gross & Goddess, and Brian J. Bartley of Sullivan & Bartley, Wilmington, Del., for plaintiff Alfred Miller.

B. Wilson Redfearn and Michael I. Silverman of Tybout, Redfearn & Pell, Wilmington, Del., for defendants ARA Medical Services, Inc. d/b/a Correctional Medical Systems and Benjamin Robinson, M.D.

Ann Marie Johnson of Delaware Dept. of Justice, Wilmington, Del., for defendants Robert J. Watson, Henry Risley, and Walter Redman.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

Pursuant to 42 *U.S.C.* § 1983, the plaintiff alleges that the defendants violated his constitutional rights by demonstrating deliberate indifference to his serious medical needs. (Docket Item ["D.I."] 64 at A1–A8.) The plaintiff's amended complaint originally named Correctional Medical Systems, Inc. ("CMS"), Dr. Robert Hooper, Dr. Benjamin Robinson, Nurse Margarite Parisi, Commissioner Robert J. Watson, Bureau Chief Henry Risley, Warden Walter Redman, and Deputy Warden Donald Davis as defendants. (*Id.*) After taking depositions, the parties stipulated to the dismissal of defendants Hooper, Parisi, and Davis. (D.I. 56.) Before the Court are the summary judgment motions of defendants Robinson and CMS (hereinafter collectively referred to as the "medical defendants")[1] and defendants Watson, Risley and Redman (hereinafter collectively referred to as the "State defendants"). (*See* D.I. 59 & 61). After oral argument, the parties stipulated to the dismissal of the claim against defendant Risley. (D.I. 70.)

## I. FACTS

The plaintiff, Alfred Miller, was an inmate at the Delaware Correctional Center from May, 1990 through March 25, 1991. (D.I. 64 at A3; D.I. 60 at A18–A40.) Miller suffers from heterotopic bone formations.

His unusual medical condition causes excess bone to form in certain parts of his body. (D.I. 60 at A4 & A80.) The condition can recur and change, for the body may continue causing the formation of bone and tissue even after treatment. (*Id.* at A4.) Miller's medical records indicate that he jumped from a five story building in New York City while running from the police in 1984. (*Id.* at A7.) The resulting injuries and the plaintiff's failure to get immediate treatment appear to have caused the condition. (*Id.*)

In April of 1988, Miller was sentenced in Delaware Superior Court. A few weeks later he was turned over to federal custody on a federal charge. (D.I. 64 at A2–A3.) Due to his condition federal authorities placed Miller at the Medical Center for Federal Prisoners at Springfield, Missouri, and Miller remained there from June, 1988 until February, 1989. (D.I. 63 at 3; D.I. 64 at A16.) During that period he underwent surgery several times to correct his jaw condition, (D.I. 64 at A10–A15), and procedures to excise bony mass and tissue in the right groin. (D.I. 60 at A9.) The plaintiff was then transferred to the Federal Medical Center in Rochester, Minnesota, in March, 1990. (D.I. 64 at A16–A18.) While at the Rochester facility he underwent radiation therapy and five surgical procedures to reshape or remove bone and scar tissue in his hip, groin, and jaw. (*Id.* at A18–A23.) By late January, 1990, the Rochester facility released Miller. (*Id.* at A24–A28.) He then pled guilty to a federal charge in New York and was sentenced to twenty months to be served consecutively with the Delaware sentence. He arrived at Delaware's Gander Hill Multi–Purpose Criminal Justice Facility in May, 1990. (D.I. 60 at A18; D.I. 64 at A3.)

CMS assumed care of Miller pursuant to its contract to provide health care to Delaware inmates. (D.I. 64 at A42–A57.) Initially two CMS staff physicians, Dr. Ken-

---

[1] The medical defendants note that CMS is not a proper defendant since no such corporation exists; the official corporate name is ARA Health Services, Inc. Nevertheless, the corporation contracted with the State of Delaware to provide services under the name CMS. (*See* D.I. 64 at A40–A58.) For the sake of clarity and brevity the Court will refer to the corporation as CMS.

dall and Dr. Terry, each examined the plaintiff. In June and July of 1990 they recommended outside surgical consultations and prescribed Percodan, a synthetic narcotic, for a short-term period. (D.I. 60 at A5, A11, & A18–A24; D.I. 63 at 7; D.I. 64 at A69–A70 & A75–A76.) Dr. Robinson was the State Medical Director for CMS during the relevant time period. (D.I. 64 at A38–A39.) Dr. Robinson is the only person who can authorize outside consultations. (D.I. 60 at A5.) There was no exact point of time at which Dr. Robinson countermanded their recommendations, but Dr. Robinson declined to undertake a surgical option. In an affidavit, he states that he made this decision in his own medical judgment given the problematic, recurring nature of the condition. Rather, he attempted to contain the plaintiff's pain by prescribing several painkillers for the time Miller was in the Delaware prisons. (Id. at A4–A5.) Dr. Robinson states that, in prescribing the painkillers, he attempted to follow the Federal Medical Center's discharge summary, (D.I. 60 at A4–A5), which recommended a "conservative" use of drugs in light of Miller's past substance abuse. (Id. at A4–A5 & A7–A10.) During the period of Miller's incarceration in Delaware, Dr. Robinson increased the dosage of these painkillers. (D.I. 64 at A90 & A97.)

On August 5, 1990, the plaintiff complained to Dr. Robinson of pain in his leg and difficulty opening his mouth. (Id. at A83–A84.) For the jaw difficulty, medical personnel took an x-ray that revealed an abnormality. (Id. at A84.) Dr. Robinson set an appointment for Miller to see Dr. Lippman, an oral surgeon. (Id. at A86.) Dr. Lippman recommended "a full workup with tomograms, etc." and "workup and treatment at Wilmington Medical Center." (D.I. 64 at A–111; see also id. at A86–A87.) Miller received a tomogram, a diagnostic tool, but no further treatment. (Id. at A98–A100.) Dr. Robinson wrote an order for Miller to get a follow-up appointment at the Wilmington Medical Center, but the

appointment never occurred. Dr. Robinson states that he does not know why the plaintiff did not get to the Wilmington Medical Center as he ordered. (Id. at A84(a)–A87, A95–A96.)

Miller also did not get his pain medication on several occasions. Miller says this happened twelve times, (id. at A158–159), although Miller filed formal grievances on only three occasions. In the cases where he did file a formal grievance, the record indicates a different cause for the unavailability of pain medication in each case. In one case medication was sent to the wrong prison building.[2] (D.I. 60 at A78.) In another case the area pharmacy with whom CMS had been dealing ran out of the Demerol liquid prescribed for the plaintiff. (Id. at A40.) Dr. Robinson prescribed Tylenol III, which the plaintiff found inadequate to control his pain. (Id. at A40, A56, & A76.) CMS personnel tried "many other [p]harmacies," but they also had no Demerol. (Id. at A40.) Demerol arrived on February 19, 1991 and was given to the plaintiff. (Id. at 9 & A76–A77.) In another instance, CMS temporarily closed the Health Care Unit because of an exterminator's visit. (D.I. 62 at Exhibit ["Ex."] D.) In each of these cases, officials made attempts to correct the problem. (D.I. 60 at A78; D.I. 62 at Ex. D.) There is no indication that any of these problems recurred after the corrective action. Dr. Robinson states that he has no knowledge of these problems and dispensing medication is not his responsibility. (D.I. 64 at A102–A105.)

Miller also wrote a letter to the warden of the prison, Walter Redman. The letter complained of the plaintiff's difficulties in getting pain medication and indicated that he is "in need of surgery." (D.I. 62 at Ex. C, p. 3.) Redman denies any knowledge of Miller or his problem and states that complaints regarding medical services are routinely forwarded to CMS.[3] There is no known response to the letter. The State

---

2. While not entirely clear, it appears that this grievance refers to the inability to get medication on two separate occasions. (See D.I. 60 at 8–9, A78.) .

3. Counsel has represented at oral argument that the notation in the corner of the letter suggests that the letter had in fact been copied and forwarded to CMS.

defendants suggest that this is because the State released Miller from its custody within a month of the letter's receipt and perhaps because Redman could reasonably rely on a CMS physician's judgment about the need for surgery. (D.I. 62 at 15; D.I. 67 at 7.)

Near the end of Miller's term of incarceration Dr. Robinson recommended early or medical parole so that Miller could get surgical treatment in the Federal Medical Center, which has access to doctors from the Mayo Clinic. (D.I. 60 at A17.) The parole board refused. The parole board has granted medical parole only in extremely rare cases. (*See* D.I. 64 at A116.) The plaintiff received no surgical treatment or consultation for the remainder of his time in Delaware. Dr. Robinson states that it is good medical practice for the doctors who performed earlier surgery to be the ones to perform the surgery again and that surgery was still elective at this time. (D.I. 60 at A5.)

Miller left Delaware in federal custody on March 25, 1991. He was incarcerated for short periods of time in FCI–Fairton in New Jersey and Ray Brook–FCI in New York. (*Id.* at A1.) Authorities brought Miller to the Federal Medical Facility in Rochester, Minnesota in August, 1991. (*Id.*) Medical personnel placed him under study and observation and performed jaw surgery in October of 1991. (*See* D.I. 60 at A1; D.I. 64 at A120–A123.) Miller has had no problem with pain or decreased movement in his jaw since that oral surgery. (D.I. 64 at A159.)

## II. THE CLAIM AGAINST DOCTOR ROBINSON

 Failure to give adequate medical treatment to prisoners is a constitutional violation when it results from "deliberate indifference to a prisoner's serious illness or injury." *Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). This standard "requires [1] deliberate indifference on the part of prison officials and ... [2] the prisoner's medical needs to be serious." *West v. Keve*, 571 F.2d 158, 161 (3d Cir.1978). In *Monmouth*

*County Correctional Institutional Inmates v. Lanzaro,* the Third Circuit elaborated on the possible means of violating the standard.

Where prison authorities deny reasonable requests for medical treatment, ... and such denial exposes the inmate "to undue suffering or the threat of tangible residual injury," deliberate indifference is manifest. Similarly, where "knowledge of the need for medical care [is accompanied by the] ... intentional refusal to provide that care," the deliberate indifference standard has been met. Short of absolute denial, "if necessary medical treatment [i]s ... delayed for nonmedical reasons, a case of deliberate indifference has been made out." Deliberate indifference is also evident where prison officials erect arbitrary and burdensome procedures that "result[ ] in interminable delays and outright denials of medical care to suffering inmates." Prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for " 'an easier and less efficacious treatment' " of the inmate's condition. Nor may they condition provision of needed medical services on the inmate's ability or willingness to pay. Finally, deliberate indifference is demonstrated "[w]hen ... prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment."

834 F.2d 326, 346–47 (3d Cir.1987), *cert. denied,* 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988) (citations omitted). *See also Guyer v. Du Pont,* C.A. No. 83–326–MMS (D.Del. Dec. 8, 1983) (D.I. 64 at A143) (inordinate delay of treatment may constitute display of deliberate indifference). These cases describe acts or omissions that fail to display a serious use of medical judgment. An incidence of negligence or malpractice does not violate the Eighth Amendment. *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292. Similarly, a difference of medical opinion between the prison's medical staff and the inmate as to the latter's course of treatment does not support a

claim of cruel and unusual punishment. *See Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir.1989.) Fairly stated, the plaintiff's theory is that he was denied or delayed treatment or given less efficacious treatment for a serious medical need because of the cost or some other unstated reason unrelated to medical treatment.

■ The medical defendants argue that *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), requires the presentation of medical evidence pursuant to Delaware's medical malpractice statute. *Erie* does not purport to require the use of state laws in giving content to the United States Constitution. As the Supreme Court stated in *Erie* itself, *"Except in matters governed by the Federal Constitution or by Acts of Congress*, the law to be applied in any case is the law of the state." *Id.* at 78, 58 S.Ct. at 822 (emphasis added). The only authority the medical defendants advanced that has a direct bearing on their theory is a state case, *Walls v. Cooper*, 604 A.2d 419 (Del.1991) (table) (text in WESTLAW) (No. 209, 1991). Although that case denied a claim under 42 *U.S.C.* § 1983 advanced without expert testimony, the Delaware Supreme Court found that "the claims asserted in the pleadings all depend on some form of medical malpractice." *Walls*, 604 A.2d 419 (1991 WL 247806 at *4). The trial court's reasoning supports a conclusion that the pleadings advanced by the plaintiff necessarily fell below the appropriate standard. *See Walls v. Cooper*, No. 88C–AU–34, 1991 WL 89874 (Del.Super.Ct. May 14, 1991), *aff'd*, 604 A.2d 419 (Del.1991) (granting summary judgment motion). Even if the Court were to accept the medical defendants' reading of the case, *Erie* suggests that state law does not serve as a necessary requirement in establishing the content of a constitutional standard, as does the Constitution itself. *See* U.S. Const. art. VI, cl. 2. "[F]ederal law, not state law, must control in determining the rules governing enforcement in a federal court of rights and remedies created by a federal statute." *United States v. Board of Harbor Comm'rs*, 73 F.R.D. 460, 462 (D.Del.1977).

■ The medical defendants argue that expert testimony is also required because deliberate indifference represents a higher standard than negligence. In order to demonstrate deliberate indifference, the plaintiff must show the defendants' actions violate the specific standards set forth and applied in *Estelle* and other cases. In many cases the argument will not be persuasive without expert medical testimony, but a requirement for such testimony cannot be presumed. Although highly relevant in this case, the failure to present medical testimony does not necessarily prevent this case from surviving summary judgment.

■ The question at this stage is whether there are any issues of material fact. *See* Fed.R.Civ.P. 56(c). On several occasions the record allows inferences that qualified medical personnel thought that either surgery or an outside consultation regarding surgery was the most appropriate path of medical treatment, and that course was not taken. This fact is sufficient to create a material issue of fact regarding whether the plaintiff had a serious medical need. *See Monmouth County Correctional Inst. Inmates*, 834 F.2d at 347. The defendants argue that there is no material issue of fact regarding whether Dr. Robinson had acted with deliberate indifference. Dr. Robinson has explained his actions as a product of his medical judgment concerning when surgery should be performed and by whom and in one case of his alleged inaction he attributed this presumably to a bureaucratic error. Dr. Robinson's explanation of events appears plausible and has support from inferences within the record. Nevertheless, his explanation implicates a consideration of credibility and state of mind sufficient to render summary judgment in favor of Dr. Robinson inappropriate. *See Young v. Quinlan*, 960 F.2d 351, 360 n. 21 (3d Cir.1992).

## III. THE CLAIM AGAINST CMS

■ The plaintiff also seeks to hold CMS liable. CMS is the private corporation responsible for dispensing medical services. Under *Monell v. Department of Social*

*Services of New York*, a municipality cannot be held liable under a theory of *respondeat superior* but can be held liable for a policy or custom that demonstrates deliberate indifference. 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *See also Heine v. Receiving Area Personnel*, 711 F.Supp. 178, 185 (D.Del.1989) ("[T]raditional concepts of *respondeat superior* do not apply to civil rights actions brought pursuant to 42 *U.S.C.* § 1983."). These principles also apply to the liability of private corporations offering those services. *Guyer v. Correctional Medical Systems, Inc.*, C.A. No. 86–361–JLL, Magistrate's Report and Recommendation, slip op. at 3 (D.Del. Apr. 16, 1990) (adopted by final order May 14, 1990). Miller argues that CMS can still be held liable under two alternative theories.

■ First, under *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), Miller argues that CMS can be held liable for one of Dr. Robinson's decisions as "the action[ ] of an officer exercising their policymaking authority." (D.I. 63 at 24.) *Pembaur* did hold that a County Prosecutor's single decision, taken as an official policymaker, made the county liable. *See id.* The complaint attempts to state a basis for CMS's liability under this theory on the premise that "Dr. Robinson was the highest policy-making official for defendant CMS for medical matters in this State." (D.I. 64 at A6.)

■ An official's decision can only be treated as policy if that official has final authority to make policy under state law. *Pembaur*, 475 U.S. at 483, 106 S.Ct. at 1300. In *St. Louis v. Praprotnik*, the Supreme Court made it clear that "the authority to make municipal policy is necessarily the authority to make *final* policy." 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1987). There can be no *de facto* final policymaking authority. *Id.* at 131, 108 S.Ct. at 928. *See also Sturgess v. Negley*, 761 F.Supp. 1089, 1097–99 (D.Del.1991) (Supreme Court precedent indicates that delegation of authority is insufficient to confer final policymaking authority).

Dr. Robinson does not possess final policymaking authority under state law, even if his decisions are final in practice. As Miller asserts in his amended complaint, it was the responsibility of the State defendants to supervise the provision of medical services. (D.I. 64 at A7). Dr. Robinson could be overruled if he announced a "policy" of not treating the plaintiff. The presence of the type of supervisory responsibility here undermines the contention that the power to make final policy has been removed from prison officials.

■ In the alternative Miller argues that CMS might be held liable for a policy or custom that was not the responsibility of Dr. Robinson but because of others "behind the scenes whose actions continually frustrate the best efforts of CMS's Medical Director." (D.I. 63 at 24–25.) There are two problems with this theory. Miller has failed to advance facts that establish a policy or custom.

"Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy or edict." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986)). Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law. *Andrews*, 895 F.2d at 1480; *see also Fletcher v. O'Donnell*, 867 F.2d 791, 793–94 (3d Cir.) ("Custom may be established by proof of knowledge and acquiescence."), *cert. denied*, [492] U.S. [919], 109 S.Ct. 3244, 106 L.Ed.2d 591 (1989). In either instance a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom. *Andrews*, 895 F.2d at 1480.

*Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir.1990); *Lowe v. Board of Commissioners*, 750 F.Supp. 697, 701 (M.D.Pa.1990).

Miller has not alleged facts that show "an official proclamation, policy or edict" or any "well-settled and permanent course of conduct" under this theory. The only conduct alleged to be repeated by CMS is the failure to give medication, but these problems arose for separate reasons. Also, as the defendants argue, the occasional unavailability of medication because of shortage or other similar failure does not rise to the level of a constitutional violation. *Lusero v. Rowland,* 967 F.2d 588 (9th Cir. 1992) (table) (text in WESTLAW, 1992 WL 144464 at *1) (No. 91–16122).

■■■ Another problem with Miller's "behind the scenes" theory is that Third Circuit precedent establishes "that the primary liability of a municipal *employee* under section 1983—as opposed to the primary liability of an official with policymaking authority—[is] a prerequisite to the section 1983 liability of the municipality itself." *Simmons v. City of Philadelphia,* 947 F.2d 1042, 1063 (3d Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992) (emphasis in original). *See also Williams v. Bureau of West Chester,* 891 F.2d 458, 467 (3d Cir.1989) ("Because ... the plaintiffs have no viable claim against any individual officer, they cannot have a *Monell* claim against West Chester.") "[P]laintiff, in order to prove either [his] municipal policy or [his] failure to train theory, must have adduced evidence of scienter of the part of a municipal actor." *Simmons,* 947 F.2d at 1062. CMS cannot be held liable "as an abstract entity." *Id.* at 1063. Consequently, Miller also cannot pursue CMS on their theory that Dr. Robinson is not responsible for allegedly unconstitutional acts.

## IV. THE CLAIMS AGAINST THE STATE DEFENDANTS

The plaintiff also seeks relief against prison authorities. Robert Watson is Commissioner of the Delaware Correctional System. (D.I. 62 at Ex. A, p. 1.) He has no daily oversight duties but has established and administered policies designed to oversee the medical care of inmates. (*Id.*) Warden Walter Redman held supervisory authority in the prison in which Miller was incarcerated. He regularly attended monthly meetings at the institution's Medical Audit Committee. (*Id.* at Ex. C.)

Miller attempts to base his theory against the state defendants on *Abdul-Akbar v. Watson,* 775 F.Supp. 735 (D.Del. 1991). The State defendants, he asserts, have an affirmative obligation to ensure access to medical care just as that case stated the obligation with regard to access to the courts. Delaware argues that a recent United States Supreme Court case, *Wilson v. Seiter,* — U.S. ——, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), demonstrates the standard used in *Abdul-Akbar* to be inappropriate. Regardless of the appropriate standard under which supervisors can be held liable for the failure to provide access to the courts, the Third Circuit has repeatedly held the "deliberate indifference" standard applicable to prison officials who oversee the provision of medical care. *See, e.g., Monmouth County Correctional Institutional Inmates,* 834 F.2d 326, 344–51; *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 761–63 (3d Cir.1979).

■■■ The Third Circuit has laid out the standard of liability for supervisory public officials alleged to have demonstrated deliberate indifference. "[T]he standard of individual liability for public officials will be found to be no less stringent than the standard of liability for the public entities that they serve." *Sample v. Diecks,* 885 F.2d 1099, 1118 (3d Cir.1989). The plaintiff must identify the specific conduct violating the plaintiff's rights, *Colburn v. Upper Darby Township,* 838 F.2d 663, 666 (3d Cir.1988), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989), and identify with particularity what supervisory officials failed to do that demonstrated a close causal relationship between the identified deficiencies and the ultimate injury, *City of Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). More specifically, the plaintiff must identify a specific practice or procedure and present evidence that could lead to a finding that (1) the existing custom and practice without that specific practice or procedure created an unreasonable risk

of inadequate medical treatment; (2) the State defendants were aware that this unreasonable risk existed; (3) the State defendants were indifferent to that risk; and (4) the failure to dispense medication properly or perform the allegedly necessary surgery resulted from the failure to employ that specific practice or procedure. *See Sample,* 885 F.2d at 1118.

The State defendants claim a lack of personal and direct knowledge of Miller's medical condition. Miller's letter to Redman, which the State defendants state was routinely forwarded to CMS, is not sufficient to create an issue of material fact regarding the direct knowledge of inadequate medical care on the part of the State defendants. Miller argues that the defendants may be held liable if they "should have known" of a constitutional violation. *See Howard v. Alkison,* 887 F.2d 134, 138 (8th Cir.1989). While the plaintiff's contention is true, the element has a special connotation in this type of case.

> [It] does not refer to a failure to note a risk that would be perceived with the use of ordinary prudence. It connotes something more than a negligent failure to appreciate the risk.... [T]he ... risk of ... injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges.

*Young,* 960 F.2d at 361; *Colburn v. Upper Darby Township,* 946 F.2d 1017, 1025 (3d Cir.1991). The presence of this type of risk cannot be implied.

> Normally, an unreasonable risk in a supervisory liability case will be shown by evidence that such harm has in fact occurred on numerous occasions[, and] deliberate indifference to a known risk will ordinarily be demonstrated by evidence that the supervisory official failed to respond appropriately in the face of an awareness of a pattern of such injuries.

*Sample,* 885 F.2d at 1118. *See also Chinchello v. Fenton,* 805 F.2d 126, 133 & n. 9 (3d Cir.1986) (plaintiff failed to satisfy essential element of supervisory knowledge

without alleging a pattern of similar misconduct).

Miller must identify a specific procedure or practice that would have prevented the alleged constitutional infringement. The plaintiff's complaint alleges that the State defendants failed to supervise the delivery of medical services adequately, failed to investigate or respond to complaints, and failed to adopt and enforce appropriate medical standards. In addition, in his brief Miller asserts more specific measures: a failure to implement a grievance about CMS without filing it with CMS; a failure to conduct an audit or "meaningful review;" and a failure to supervise the CMS contract adequately. Of course the defendants dispute the general characterization of CMS's services as inadequate.

With regard to the dispensing of medication, the plaintiff has failed to identify a specific practice or procedure that would have prevented the problems or that the dispensing process involved constitutional violations. Three times Miller used the grievance procedure to complain about the failure to administer medication. These failures happened for three different reasons, and each time the authorities attempted a corrective measure. The plaintiff has presented no facts that raise an inference to think these measures were inadequate to prevent future occurrences of a similar nature in the future. Nor has the plaintiff presented facts that could establish that the method of dispensing medication creates an unreasonable risk of inadequate medical treatment without a proposed practice or procedure.

With regard to the oversight of dispensing medicine and the oversight of medical diagnosis and care, another element is lacking. Miller has alleged that the medical defendants refused to perform surgery for reasons unrelated to medical treatment. (D.I. 64 at A3; D.I. 65 at 8.) Yet he has not shown how the risk of a bad faith refusal to perform surgery could have been "sufficiently apparent" so as to raise a question of deliberate indifference. Nothing indicates that the State defendants

"should have known" of such a risk in the decision whether or not to perform surgery, assuming it existed, or that the grievance system would fail, assuming it did. Miller does not identify a pattern of similar mistreatment in medical care or a pattern of failure on behalf of the grievance system to prevent other constitutional violations.[4] Because the plaintiff has failed to advance facts that create an issue of material fact with regard to an essential element of his case, the claims against all of the remaining State defendants will be dismissed.

An order will be entered consistent with this Memorandum Opinion.

4. The plaintiff urges consideration of the Attorney General's Latino Task Force Report ("Report"). The Report reflected the findings of an inquiry into the deaths of three Hispanic inmates during the relevant time period. While the Report contains comments disapproving of CMS's performance in certain respects, (*see, e.g.,* D.I. 64 at A140), it does not allege facts that could reasonably lead to a finding of a pattern relevant to the resolution of this case. The Report's firmest conclusion is that the inmates' deaths were *not* the result of deliberate failures to treat the inmates because of their race or ethnic origin. (*See* D.I. 67 at Ex. B, p. 38.)