**Dana ANDREWS, Plaintiff,**

**v.**

**CAMDEN COUNTY, Michael W. McLaughlin, Camden County Sheriff, David Owens, Warden Camden County Correctional Center, Corrections Medical Services and Dr. Ronald Rahman, M.D., Defendants.**

**No. CIV. 98–2548(JBS).**

United States District Court, D. New Jersey.

March 28, 2000.

Jacob Sless, Thomas Bruno, II, Abramson & Denenberg, P.C., Cherry Hill, NJ, for Plaintiff.

Robert G. Millenky, County Counsel by M. Lou Garty, Assistant County Counsel, Camden, NJ, for Defendants County of Camden, Owens, and McLaughlin.

Stephen D. Holtzman, Vanessa P. Patrizi, Lally, Holtzman, Gilligan, Duffin & Quasti, P.C., Cherry Hill, NJ, for Defendant Correctional Medical Services, Inc.

Timothy M. Crammer, Paarz Master Koerning Crammer O'Brien Bishop & Horn, Linwood, NJ, for Defendant Ronald Rahman, M.D.

## *OPINION*

SIMANDLE, District Judge.

### I. *INTRODUCTION*

In this prisoner civil rights case, plaintiff Dana Andrews, a past inmate at Camden County Correctional Center (CCCF), has sued Camden County, Camden County's Sheriff, the Warden of CCCF, Corrections Medical Services (CMS), which is the private contractor providing inmate medical services at CCCF, and CMS physician Dr. Ronald Rahman, M.D. Plaintiff alleges that—while he was incarcerated at CCCF in June of 1996—defendants were deliberately indifferent to his need for treatment of a life threatening infection, and that this indifference caused him to suffer severe injuries which nearly caused his death. Plaintiff has filed suit in this Court alleging violations of 42 U.S.C. §§ 1983, 1985 & 1986, and state common law.

Presently before the Court are the summary judgment motions of defendants Camden County, Owens and McLaughlin (collectively the "Camden County Defen-

dants") and CMS as against plaintiff's claims arising under § 1983 in Counts I and III of the amended complaint.[1] The primary issue for decision in the present motions is whether there is any evidence that CMS and the Camden County defendants engaged in a pattern or practice because of which plaintiff was denied treatment for a serious medical condition, and which was a substantial factor in causing his injuries.

As discussed herein, the Court finds that plaintiff has come forward with evidence showing that he suffered from a serious medical need which manifested itself as a painful infection and developed into a near-fatal sepsis for which he received no medical treatment despite numerous requests. He has also presented evidence tending to demonstrate that, at the time he was incarcerated, CCCF was being operated without a facility Medical Director, as required by the CCCF–CMS contract and national prison health services accreditation authorities, and that CCCF was employing a substandard system of receiving and treating inmates' medical needs. The Court finds that this evidence creates a genuine issue as to (1) whether defendants knew or should have known of these deficiencies, (2) whether these deficiencies amounted to a policy or pattern of defendants' indifference to significant medical needs, (3) whether defendants were deliberately indifferent to the unreasonable risk to plaintiff's rights posed by these deficiencies, and (4) whether these breaches were a substantial factor in bringing about plaintiff's injuries. For these and other reasons discussed herein, the Court will deny defendants' motion for summary judgment against plaintiff's claims brought under § 1983.

1. The present Opinion does not address and has no bearing on the pending motion for summary judgment filed by defendant CMS against plaintiff's amended complaint Counts II, IV, V and VI and VII—claims arising under 42 U.S.C. §§ 1985 & 1986 and state common law. The Court recently has approved the stipulation of dismissal of these counts as against the Camden County defendants. The Court also notes that defendant Dr. Rahman has not joined in the present motions to dismiss. Therefore, this Opinion has no bearing on any of plaintiff's claims against Dr. Rahman, and no bearing on Counts II, IV, V and VI and VII as against CMS.

## II. *BACKGROUND*

Andrews has sued CMS and numerous other defendants under 42 U.S.C. §§ 1983, 1985, 1986 & 1988, and various state common law causes of action, alleging that the defendants' deliberate indifference to his serious medical needs while he was incarcerated at the Camden County Corrections Facility (CCCF) was a substantial factor in causing him to develop a blood infection which nearly caused his death soon after his release from jail on June 21, 1996. The facts relevant to deciding this motion, taken in a light most favorable to plaintiff as the non-movant, are as follows.

### A. *CCCF Medical Care Procedures*

CCCF is a Camden County-maintained facility that houses persons charged with crimes pending hearings or the posting of bail, as well as some persons who have been sentenced to incarceration. By necessity, Camden County provides medical treatment to sick or injured inmates. The County has elected to delegate its duty to provide medical care, and has contracted with defendant Correctional Medical Services (CMS), a Missouri corporation in the business of providing correctional health care services, to provide licensed doctors and nurses to staff the jail's medical unit and provide medical services as needed. (Camden County Ex. 3 at 1 (CCCF–CMS contract), Pl.Ex. 3.) Among other of CMS's duties set forth in the CCCF–CMS contract is that inmates must be given a health screening upon arrival at CCCF, and must provide non-emergency care to inmates where warranted. (Camden County Exs. 4 & 5 (CCCF medical screening policies).)

Under the CCCF–CMS contract, the governing health care procedures for CCCF are outlined in the "Health Services Policy & Procedures Manual" (hereinafter the Manual or Procedures Manual), a manual generated by CMS. The Manual excerpts attached to the parties' briefs show that each individual policy entry was reviewed and signed by CCCF Warden Owens, the CCCF Medical Director, and a CMS administrator.

Under the policies outlined in the manual, final inmate healthcare decisions are made by the facility Medical Director. The Medical Director is an important position within the CMS–CCCF relationship. As stated by Warden Owens in his deposition, "each facility must have a Medical Director. That director must be a licensed physician. That is the only individual that can offer a medical opinion." (Owens Dep. at 49:6–9.)

In addition to final individual healthcare decisions, the Medical Director has the authority to make recommendations to the Warden concerning inmate healthcare policies.[2] (Camden County Ex. 19.) According to Warden Owens, although there may be other medical doctors at the facility, there is only one Medical Director, and that individual is the chief doctor at the facility. (Owens Dep. at 121:14 to 122:8.) Initially, plaintiff named as a defendant to this suit Dr. Ronald Rahman, M.D., whom plaintiff believed to be the Medical Director at the time he was jailed.

It is important to note, however, that Andrews now has discovered evidence showing that, during the period Andrews was jailed, Dr. Rahman actually was not the Medical Director for CMS between June 13–21, 1996, but was instead employed solely as an intake physician. Apparently, Rahman temporarily held the post of Medical Director in 1995, during which time he performed approximately

---

2. Specifically, manual entry Procedure No. 2, "Medical Autonomy" provides:

1. The Medical Director, designated by CMS, and approved by the Warden, **has final responsibility for making or approving all medical decisions, and making policy recommendations to the Warden** **regarding the care provided to inmates of the institution** ....

2. Decision on the type of treatment and need for transfer to outside resources will be the responsibility of the Medical Director ....

(Camden County Ex. 19 (emphasis added).)

thirty (30) hours of clinical physician duties as an independent contractor, and an additional ten (10) hours as a part-time medical administrator in the capacity of an employee. (Dep. of Dr. Ronald Rahman at 63:11–22, Pl. Supp. Ex. A.) In 1995, Rahman left the facility altogether, but returned in 1996 in the limited capacity of doing tuberculosis screening and intake physicals at CCCF. (Rahman Dep. at 34:6–23, 37:4–12.) During 1996, Rahman's title was that of Intake Physician, and his role was purely that of an independent contractor for CMS. (Rahman Dep. at 54:8–12; 55:4–14.) To the best of Rahman's knowledge, CCCF had *no* designated Medical Director at the time plaintiff was incarcerated. (Rahman Dep. at 53:2–16.) Rahman has stated that he only saw Andrews during Andrews' initial screening and follow-up.

Part of Rahman's legacy from his tenure as CCCF Medical Director is the "sick call" system of care delivery. According to Rahman, CCCF and CMS agreed to implement this system at his request when he came on board as Medical Director. (Rahman Dep. at 136:17–18.) The procedure for this system is set forth in Health Procedures Manual Procedure entry No. 38.00, "Daily Handling of Non–Emergency Medical Requests", (Pl.Ex. R), which provides:

1. Inmates of the Institution will have access to non-emergency healthcare by **submitting a written request that is triaged by a qualified healthcare staff member** on a daily basis.

2. A designated **healthcare staff member will make rounds in segregation areas to solicit health-care requests from segregated inmates.**[3]

(*Id.* at 1 (emphasis added).) Procedure No. 38.00 also provides that "an approved Health Services Request Form will be provided in each housing unit or other designated areas", and that "[w]ritten requests will be collected daily at scheduled times in each designated area." Once the inmate medical request slips are collected, "[t]riage decisions, or inmate assessment, will be documented on Health Services Request Form or Medical Record." (*Id.*)

Under the above procedures, this medical request slip system allowed inmates themselves to place requests for medical care in boxes at the unit command post, or "pod", which then were emptied by nurses at the end of the day. Corrections officials do not have keys to these boxes. (Rahman Dep. at 136:17 to 138:12, 154:15 to 158:7.) Once the slips are emptied from the pod boxes, the requests are then reviewed by CMS employees acting in their capacity as CCCF health care providers.

### B. *Andrews' Incarceration at CCCF*

It is undisputed that Andrews was held on misdemeanor drunken driving charges at CCCF, area 3 South, from June 13, 1996 until June 21, 1996. Andrews has testified that he was medically screened after his admission to CCCF, and reported no medical problems to the screening personnel. (Andrews Dep. at 95:4–25, Pl.Ex. F.) At this screening, the condition of plaintiff's teeth was listed as "good", and the condition of gums was marked as "healthy". (Pl.Ex. H at 4.) Upon admission, Andrews was given an inmate handbook, which described the procedure to follow if he needed medical attention. (*Id.* at 60:3–17.)

---

**3.** In an effort to show that this segregation round policy was not being followed at CCCF, plaintiff submitted the signed statement of New Jersey Department of Corrections employee Derrick Berry. (Pl.Ex. K.) In this statement, Berry maintains that it is CCCF's "unspoken policy" that, after the initial medical screening, "little or no medical attention" is administered thereafter unless there is im-

minent danger to the inmate's health. (*Id.*) However, defendant CMS has shown that Berry's statement is not based on firsthand knowledge, and plaintiff apparently has withdrawn his reliance on Mr. Berry's statements. (*See* September 29, 1999 Ltr. of Jacob Sless, Esq.) Accordingly, the Court will not consider Berry's statement for the purposes of this motion.

Andrews has testified that he understood the handbook as providing that if he had any type of medical problems, he was to submit a medical request form. (*Id.* at 10–17.)

Five days after being taken into custody at CCCF, facility Counselor John Penn conducted an intake interview of Andrews on June 18, 1996. (Penn Dep. at 12, Pl.Ex. E.) Apparently, part of the social work intake interview protocol is for the interviewer to make note of inmates' medical needs. (*Id.*) Penn noted that Andrews was suffering from "flu symptoms", and noted this in a typed memorandum captioned "Inmates with Possible Med. Issues" addressed to Dr. Rahman. (Penn Mem. to Rahman, Pl.Ex. D.) Rahman has testified that he never received this memorandum, and that he never received *any* such memos from counseling staff because the sole mechanism for notifying CMS of medical needs was the above-detailed system of "sick call". (Rahman Dep. at 154:15 to 158:7.) It is unclear from the record before the Court why such memos were prepared if not for the purpose of notifying Medical Staff of inmate needs. A reasonable factfinder could conclude that Penn's memo was sent to Dr. Rahman.

Andrews has testified that, soon after his interview with Penn, he developed a severe, infected toothache, which rapidly reduced him to a sweating, weakened state. (Andrews Dep. at 98–107.) While in this weakened state, Andrews states that he saw a man he thought to be an African–American nurse or doctor wearing a cast come into his cell to check on Andrews' cellmate's hand injury. (*Id.* at 98:13 to 99:9.) Andrews alleges that he requested medical attention from this man,[4] who purportedly responded by asking Andrews if he was withdrawing from drugs. (*Id.* at 100:4–6.) Andrews reported that he was not, and the man left. (*Id.*) Andrews did not see this individual again, and received no medical care of any sort. (*Id.*) There is

no note of this interaction in the record, and no indication that CMS personnel followed the CCCF health policy of making "rounds in segregation areas to solicit healthcare requests from segregated inmates" like Andrews, as provided in Procedure No. 38.00.

After his release from lockdown, Andrews alleges that on three separate occasions he made his way to the Unit "pod" and verbally requested medical attention from several unidentified Correctional Officers (C/Os) stationed there. While he cannot recall the specific dates or times, Andrews has testified that on each occasion he complained of his pain and illness, and a C/O then would give Andrews the proper form. Andrews states that he then would fill it out, writing that he needed to see a doctor or a dentist, and would personally put the form in the sick call box there at the pod, which was the only box present. (*Id.*) Despite Andrews' recollection of filling out these forms, there is no record that he did so in relevant log notes, and Andrews never received treatment at CCCF. (CCCF post logs, Pl. Supp. Ex. D.)

According to CCCF log records, Dr. Rahman was present on the block area in 3 South on June 18, 19 and 20, 1996, but never saw plaintiff. (*Id.*) Moreover, Rahman testified that he never received the memo addressed to him by counselor Penn, and that there was no system of delivery set up so that such a memo would be routed to him or any other Doctor on duty. (Rahman Dep. at 157–60.) According to Rahman, the counselor's job in instances where an inmate appears to be ill is to make sure that the inmate has and is able to fill out a sick call slip. Rahman also states that if a counseling "health needs" memo has been generated, the inmate more than likely already has filled out a sick call slip. (*Id.* at 165:5–10.)

During this period, Andrews' medical distress was obvious to his cellmate, Mau-

---

4. Plaintiff anticipates that, given the opportunity, he will be able to identify this individual as Ronald Rahman, M.D. (Am. Compl. at ¶ 50.)

rice Williams. Mr. Williams, in a signed statement, described his observations from the four days during which he shared a cell with Andrews. According to Williams, "their [CCCF's] rules are that you don't get to talk to anybody until after that 7-day period". Williams described Andrews' condition as "he had a bad toothache and kept asking for something for pain" but "[they] never gave him anything." Williams maintains that Andrews "didn't eat" and his "mouth was all swollen like it was abscessed." Williams also contends that, despite Andrews' obvious distress, the guards did nothing because they "thought [Andrews] was on drugs", and "[they didn't care what was wrong with him.]" (Williams Stmt. Dated December 4, 1998, Pl.Ex. G.)

Camden County released Andrews from its custody on June 21, 1996. (Id. at 115:25 to 116:2.) Apparently perceiving her son to be very ill, Andrews' mother immediately took him to the emergency room at West Jersey Hospital, Berlin Division, where he was promptly admitted and diagnosed with sepsis—an overwhelming systemic infection of the bloodstream—and multiple organ failure due to the sepsis. He remained hospitalized at West Jersey, and later at Our Lady of Lourdes Hospital, for a combined total of over four months. Hospital records indicate that during his hospitalization, Andrews had at least two operations and nearly died as a result of his sepsis and organ failure. (West Jersey Hospital Discharge Summary, Pl.Ex. P at 4.) Presently, Andrews suffers from chronic diabetes, which may or may not have been caused by the infection, and now requires dialysis due to kidney damage. (Id. at 118:3 to 130:24.)

Plaintiff filed suit in this Court on June 5, 1998, and filed his current amended complaint on September 3, 1999. Plaintiff's amended complaint claims that all defendants violated his rights under the Fourth, Fifth, Sixth, Eighth, Thirteenth and Fourteenth Amendments of the federal constitution in violation of 42 U.S.C.

§§ 1983, 1985, 1986 & 1988, and asserts state law claims of negligence, intentional and negligent infliction of emotional distress against all defendants, and a claim of medical malpractice against CMS and Dr. Rahman. (Am.Compl.¶¶ 61–119.) Plaintiff has particularly pleaded a claim that defendants engaged in a pattern, practice or custom of condoning, and/or acquiescing to the denial of necessary medical treatment by corrections officials and officers in reckless disregard of the rights of inmates. (Id. at 95.) Defendants presently challenge plaintiff's § 1983 claims on the basis that he has not come forward with evidence of willful indifference. Camden County also seeks summary judgment as against plaintiff's claims against Sheriff McLaughlin and Warden Owens, both on grounds of insufficiency of evidence and qualified immunity.

## III. DISCUSSION

### A. Summary Judgment Standard

A court may grant summary judgment when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id.

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party. See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080–81 (3d Cir.1996); Kowalski v. L & F Prods., 82 F.3d 1283, 1288 (3d Cir. 1996); Meyer v. Riegel Prods. Corp., 720

F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. 2505; *Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 329–330 (3d Cir.1995) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505) ("[T]he nonmoving party creates a genuine issue of material fact if it provides sufficient evidence to allow a reasonable jury to find for him at trial.").

The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Jalil v. Avdel Corp.,* 873 F.2d 701, 706 (3d Cir. 1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990).

**B.** *Section 1983* **Standard**

Plaintiff has alleged that, in committing the above described violations, defendants acted under color of state law to deprive him of his Eighth Amendment right to be free of cruel and unusual punishment, and thus violated 42 U.S.C. § 1983. The statute invoked, 42 U.S.C. § 1983, is a powerful legislative "sword" providing injunctive relief and damages for the benefit of citizens whose Federal Constitutional rights have been violated by persons acting on behalf of a state or local government. Since its enactment, § 1983 has become Congress's primary means of protecting United States citizens from illegal state action. Sheldon H. Nahmod, *Civil Rights and Civil Liberties Litigation: The Law of Section 1983* § 1.1 (4th ed.1997).

■ Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Thus, to properly assert a claim for alleged violations of his constitutional rights pursuant to 42 U.S.C. § 1983, a plaintiff must allege (1) a violation of a right secured by the Constitution and laws of the United States, and (2) that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

■ In this case, it is undisputed that the defendants named in Andrews' complaint acted under color of state law.[5] In order to succeed in his § 1983 claims, then, Andrews must establish that defendants operated with either "deliberate indifference" to his injuries or had "knowing willingness" that harm would occur. *Unwin v. Campbell,* 863 F.2d 124, 135–39 (1st Cir.1988) (citing *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). He also must be able to prove "specific conduct violating the plaintiff's rights, the time and the place of that conduct, and the identity of the responsible officials." *Colburn v. Upper Darby Township,* 838 F.2d 663, 666 (3d Cir.1988), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989).

---

**5.** Deliberate indifference to medical needs is a theory actionable under § 1983, and plaintiff has alleged all necessary elements for such a claim. Accordingly, defendant CMS's motion to dismiss for failure to state a valid claim, pursuant to Rule 12(b)(6), Fed.R.Civ.P., is without merit and will be denied.

## C. Deliberate Indifference to Medical Needs

The Eighth Amendment to the United States Constitution, applicable to the individual states through the Fourteenth Amendment, prohibits the states from inflicting "cruel and unusual punishments" on those convicted of crimes. *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). This prohibition against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle*, 429 U.S. at 103–04, 97 S.Ct. 285. In order to set forth a cognizable claim for a violation of his right to adequate medical care, an inmate must allege: (1) a serious medical need; and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need. *Id.* at 106, 97 S.Ct. 285.

The Court first addresses defendant CMS's motion for judgment against plaintiff's claims for failure to meet *Estelle*'s first prong: seriousness of medical needs. To satisfy the first prong of the *Estelle* inquiry, the inmate must demonstrate that his medical needs are serious. "[B]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Serious medical needs include those that have been diagnosed by a physician as requiring treatment or so obvious that a lay person would recognize the necessity for a doctor's attention; and those conditions which, if untreated, would result in lifelong handicap or permanent loss. *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir.1987), *cert. denied*, 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988). In cases where a prisoner has alleged deliberate indifference, he cannot recover unless he has shown that his affliction is so serious that a "lay person would easily recognize the necessity of a doctor's attention." *Id.* at 347.

CMS asserts that there "simply is no evidence to establish that plaintiff was suffering from a serious medical condition during his eight day incarceration or at any time prior to his incarceration." (CMS Br. at 22.) The Court disagrees. It is manifest that Andrews has adduced sufficient evidence to create a genuine issue as to whether his medical conditions were serious. Plaintiff's deposition testimony, detailed above, paints a picture of a fevered inmate in obvious pain, his face swollen by infection, who repeatedly requested medical assistance. The written statement of Andrews' cellmate, Maurice Williams, corroborates Andrews' account of the progression of his illness. Documentation exists to corroborate Andrews' complaints to the counselor and to the guards, contemporaneously with this ordeal in the jail. A jury should be given the opportunity to judge the truthfulness of these descriptions.

In addition, it is undisputed that after his release from custody at CCCF plaintiff's mother took him directly to an area emergency room, where he and spent the next four months hospitalized and battling the lethal infection apparently contracted and untreated while at CCCF. The Court finds that a reasonable juror could infer that, if plaintiff's mother was able to immediately perceive the illness, then Andrews' medical needs were obvious.

Plaintiff's experts also state that Andrews' needs would have been obvious. Dr. Steven Nagelberg, M.D., F.A.C.E., an Endocrinologist (Nagelberg Ltr. Dated February 21, 1999 at 2, Pl.Ex. M), and Dr. Michael L. Silverman, M.D., an Infectious Disease Specialist (Silverman Ltr. Dated February 15, 1999, Pl.Ex. N at 2), both reported that in their opinion, plaintiff's illness likely would have been observable during plaintiff's incarceration. Based on the foregoing, the Court finds that there is sufficient evidence in this case to allow a

jury to find that plaintiff's injuries were both serious and obvious during his confinement at CCCF.

▮▮▮▮ The Court next turns to a discussion of the second prong of the *Estelle* test: whether any or all defendants were deliberately indifferent to plaintiff's serious medical needs. The second element of the *Estelle* test requires an inmate to show that prison officials acted with deliberate indifference to his serious medical need. "Deliberate indifference" is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 837–38, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Furthermore, a prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference. *Peterson v. Davis*, 551 F.Supp. 137 (D.Md.1982), *aff'd*, 729 F.2d 1453 (4th Cir.1984). Similarly, a prisoner's disagreement with prison personnel over the exercise of medical judgment does not state a claim for relief. *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1080 (3d Cir.1976). "Courts will disavow any attempt to secondguess the propriety or adequacy of a particular course of treatment ... [which] remains a question of sound professional judgment." *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (internal quotation and citation omitted). Even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, at most what would be proved is medical malpractice and not an Eighth Amendment violation unless deliberate indifference be shown. *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir.1990). The hallmark of an Eighth Amendment violation arises when such medical treatment, or the withholding of medical treatment, is accompanied by knowing indifference to the pain or risk of serious injury this will cause, such as by "persistent conduct in the face of resultant pain and risk of permanent injury." *Id.* at 109.

▮▮▮▮ Here, plaintiff has asserted that the Camden County defendants and CMS are liable for his injuries because they were deliberately indifferent to a policy, pattern, or practice that resulted in a deprivation of his constitutional right to adequate medical care. This theory is consistent with the doctrine announced in *Monell* that a municipality may not be held liable under a theory of *respondeat superior*, but can be held liable for a pattern, practice, or custom that causes a constitutional violation. *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Such liability can be based on a single incident; a policy, practice or custom claim does not necessitate proof of a long-standing practice. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). It is of no moment that Camden County delegated to CMS its responsibility of caring for inmates' medical needs. When contracting for prison health services, a county or municipality still remains liable for constitutional deprivations caused by the policies or customs of the health service. *See Miller v. Correctional Medical Systems*, 802 F.Supp. 1126, 1132 (D.Del. 1992). This is especially true if the county has knowingly failed to reasonably enforce the terms of the delegation to require an adequate level of care for persons in plaintiff's circumstances, as alleged here. Therefore, both Camden County and CMS must answer for any pattern or practice that amounted to deliberate indifference.

▮▮▮ The question then becomes whether plaintiff has adduced sufficient evidence to create an issue as to whether a pattern, practice or custom of defendants amounted to deliberate indifference to Andrews' right to adequate medical care. The Third Circuit has provided a framework for this analysis, under which, in order to survive a summary judgment motion, a plaintiff must first identify a particular offending procedure or practice, and must present evidence showing that (1) the custom, practice or procedure created an

unreasonable risk of inadequate medical treatment; (2) the defendants were aware that the unreasonable risk existed; (3) the defendants were indifferent to that risk; and (4) the failure to provide adequate medical treatment resulted from the failure to employ the identified practice or procedure. *See Sample v. Diecks,* 885 F.2d 1099, 1118 (3d Cir.1989); *Miller,* 802 F.Supp. at 1131.

### 1. *What is the Policy or Custom in Question?*

It is important to note that plaintiff has not adduced any evidence that there was a written policy that created an unreasonable risk of deprivation of medical care for serious conditions. Rather, plaintiff has identified a policy that should have been followed but was allegedly deliberately ignored for months. Specifically, plaintiff in his complaint and moving papers asserts that CCCF should have followed its contract with CMS, its own guidelines, and those of national prison accrediting authorities, all of which mandate that every prison must have on staff a facility Medical Director responsible for inmate health care decisions. Second, plaintiff has argued that, at the time he was incarcerated, because there was no Medical Director on staff at CCCF, the absence of a Medical Director made possible the re-emergence at CCCF of an ineffectual "memorandum system" of notifying health care providers of inmates' medical needs, which policy helped to create the circumstances giving rise to his injuries. Third, plaintiff has alleged that the County's indifference was a substantial cause of his harm, because the unsupervised part-time medical provider failed to attend to him and because the County's own employees in the jail failed to adequately communicate his medical needs during his period of painful crisis.

█ The Court thus must address one of the knottier legal questions in this case: whether defendants' deliberate or reckless ignorance of the requirement that a Medical Director be on staff is evidence of a custom or policy that created an unreasonable risk of violating inmates' Eighth Amendment rights. For reasons discussed below, the Court concludes that it is.

█ Generally, in cases where a plaintiff is pursuing a policy or practice-type claim, a plaintiff must first identify a specific offending policy. However, a negative theory may also be pursued, in which the plaintiff is allowed to identify a policy or practice that was nominally in place, but deliberately ignored. It is well established that in § 1983 suits, a municipality may be held liable for *not* having in place a policy that is necessary to safeguard the rights of its citizens, or for failure to act where inaction amounts to deliberate indifference to the rights of persons affected. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). *See also, Vineyard v. County of Murray,* 990 F.2d 1207, 1212 (11th Cir.1993) (failure to enact adequate procedures of recording police complaints); *Oviatt v. Pearce,* 954 F.2d 1470, 1477–78 (9th Cir.1992) (failure to alleviate the problem of inmates' missed arraignments).

█ In this case, it is undisputed that the CMS Medical Director was a position of considerable importance and authority at CCCF. The CMS–CCCF contract described above mandates that CCCF have in place a Medical Director to make final decisions regarding inmate health care and to recommend health policies to the CCCF Warden. Further, when asked about the contract, Warden Owens agreed in his deposition that the Medical Director is essential to the operation of the facility. Such evidence must be assessed in light of plaintiff's evidence tending to show that CCCF and CMS disregarded their policy of soliciting direct inmate requests for medical care, including thorough daily rounds of segregated inmates, as discussed above, which was allegedly ignored. Based on this record evidence showing that the Medical Director played a crucial role in

the CMS–CCCF relationship, and that CMS and CCCF abandoned the requirement of daily direct medical rounds to segregated inmates like Andrews, and that the employment of a Medical Director was requisite to CCCF's gaining accreditation from national prison health authorities, the Court holds that a jury could find that it would be in reckless disregard for inmates' Eighth Amendment rights to operate CCCF without a direct inmate request system and without a Medical Director in place. Evidence of CCCF's indifference to adhering to this contract and these accreditation standards is not conclusive: at this point the Court has found only that plaintiff has come forward with evidence from which a reasonable jury could find that defendants' failure to follow their own policy (and relevant national standards) of having in place Medical Director—a position essential to the safe function of the facility's health services-created an unreasonable risk to inmates' rights.[6]

Having decided that, if defendants knowingly failed to enforce the requirements that a Medical Director be in place and that medical rounds be conducted daily to visit segregated prisoners, this is evidence of reckless disregard of a condition creating an unreasonable risk of violation of inmates' Eighth Amendment rights, the Court next turns to a discussion of whether plaintiff has come forward with evidence that a Medical Director was *not* in place at the time he was in custody.

In support of this argument that there was no Medical Director, plaintiff has cited to Dr. Rahman's deposition testimony where Rahman states that he was not

CMS's Medical Director after 1995, and was instead only acting as an intake physician at the time Andrews was incarcerated in June of 1996. (Rahman Dep. at 34:6–23, 37:4–12.) It is undisputed that when he was acting as Medical Director, Rahman's duties included ten hours per week of administrative duties. Once his stint as Medical Director had concluded, his administrative duties also ended. Rahman was direct and unequivocal on this issue. At his deposition, the following exchange occurred between Rahman and plaintiff's counsel:

Q: In 1996, May and June, were you a part-time medical administrator for CMS?"

A: No.

Q: —at Camden County?

A: I believe not.

Q: You were not required to perform ten hours of part-time medical administration for CMS at Camden County facility in May and June of 1996?

A: Absolutely not.

Q: If CMS has answered discovery saying that you were, then they would be incorrect?

A: They better—they owe me some money then.

. . . . .

Q: And in June of 1996, you were an independent contractor as an intake doctor?

A: Exactly.

Q: Nothing more, nothing less?

---

**6.** This holding should not be read to create a constitutional cause of action for violation of the CCCF Health Procedures Manual, or for violation of any of the provisions therein. Section 1983 creates a remedy only for violations of the federal constitution or laws. Thus, to the extent that an everyday breach of a provision of a prison health services manual is actionable, a remedy would be found only in state contract law. *See* N.J.S.A. 59:13–3 (New Jersey has waived immunity to contract suit). *Cf. Anderson v. Redman*, 429 F.Supp.

1105 (D.Del.1977) (prison manual afforded weight of state statute). It is because the accreditation standards and the CMS–CCCF contract show the critical importance of the Medical Director position and daily medical rounds to segregated inmates to the maintenance of constitutionally adequate healthcare at CCCF that the Court finds that disregarding the minimal standards of inmate health care rises to the level of creating a risk of constitutional deprivation.

A: Nothing more, nothing less.
(Rahman Dep. at 53:12 to 54:5 and 55:10–14.) The Court finds that Rahman's uncontradicted testimony that in 1996 he was an intake physician, and no longer performed administrative duties as required by the Medical Director job description, establishes that he was no longer working in the capacity of Medical Director at the time of Andrews' incarceration.

Defendants have not come forward with any concrete evidence showing that someone else besides Rahman was the CCCF medical director during the relevant time period. CMS has attempted to explain this apparent break in the chain of medical command at CCCF by weakly suggesting that Rahman "was confused as to the dates of his employment with CMS as the Medical Director".[7] (CMS Surreply Ltr. Br. at 6.) At best, CMS's explanation merely creates a debatable issue as to whether there was a Medical Director on staff at all. Camden County has no explanation for the apparent lack of a Medical Director, but nevertheless asserts that this issue is immaterial. The Court is not persuaded by the County's attempt to trivialize this important issue.

If at trial plaintiff is able to establish that there was in fact no Medical Director at CCCF during the relevant time period, then plaintiff will have established a glaring indifference to the minimal standards of the CMS–CCCF contract, an agreement of which inmates like Andrews were intended beneficiaries. While plaintiff's evidence at this point is not conclusive, proof by a preponderance of the evidence is not required at this stage. All plaintiff need do to prevent summary judgment is create a genuine issue as to whether the prof-

fered policy was not followed, and that defendants were deliberately or recklessly indifferent to the fact that this policy was not being followed, and that this practice of indifference to medical needs was a substantial cause of his deprivation of constitutionally minimal care. Based on the abundant record evidence supplied by plaintiff showing that there was no Medical Director in office at the time of his incarceration, the Court finds that plaintiff has created a genuine issue as to whether a Medical Director was in place at the time Andrews was jailed, and that a reasonable jury could conclude that there was not. It follows that a reasonable jury could also conclude that the defendants' decision not to have a Medical Director, despite the requirements of the CCCF–CMS contract and minimum national standards, is evidence of indifference to serious medical needs of inmates, including the plaintiff, during the relevant time period.

### 2. Whether Defendants' Failure to Have in Place a Medical Director May Constitute Deliberate Indifference

Having determined that plaintiff has identified a particular procedure or custom that allegedly led to a deprivation of his rights, the Court next turns to a discussion of whether plaintiff has come forward with evidence sufficient to satisfy the strictures of the *Sample* test described above.

### a. Prong One: Whether an Unreasonable Risk Results From Defendants' Failure to Follow the Proffered Procedure

The first prong of the *Sample* test is whether plaintiff has come forward with

---

**7.** CMS's only support for its argument that Dr. Rahman is mistaken as to his dates of employ is a heavily edited and unhelpful CMS payroll sheet for the period from 6/1/1996 to 6/30/1996. All information is blacked out except that which appears to show that Rahman was paid $1,666.66 for 136 hours of work during the relevant period. This document is not accompanied by a certification or affidavit explaining who prepared the payroll, or what the proper pay scale was for an Intake Physician versus a Medical Director. The Court expects that, if plaintiff was incorrect in his assertion that CCCF had no Medical Director, then defendants would have come forward with competent evidence to the contrary. They have not done so.

evidence showing that an unreasonable risk resulted from the facility's failure to follow the proffered procedure. The Court finds that plaintiff has met this burden.

Plaintiff asserts that, due in large part to the absence of a Medical Director at CCCF, the facility had reverted back to the "memorandum system" of care that was in place prior to Dr. Rahman's hiring as Medical Director. Under this unaccredited system, if an inmate wanted medical care, he would notify CCCF staff, who then would draft a short memo notifying an on-duty doctor or nurse of the inmate's need for medical treatment. An example of such a memo is the one drafted by Counselor Penn described above. Dr. Rahman has testified that during his tenure as Medical Director for CCCF, he helped work to abolish this memorandum system in favor of the accredited "sick-call box" system by which inmates themselves request medical attention. (Rahman Dep. at 137:16–17, 155:19–20.)

According to Rahman, the fact that such a memo was generated with respect to Andrews' condition indicates that it is possible that the memo system was still being used in June of 1996, or that CCCF went back to the memo system after his tenure as CCCF Medical Director ended in 1995. Specifically, in the context of the particular facts of this case, Rahman stated that, the fact that the memo from counselor Penn was generated on June 18, 1996 may indicate that inmates were not being seen as efficiently as when he was the medical director, and that in his opinion "there must be a reason they generated it." (Id. at 159:22 to 160:10.) While it is only Rahman's opinion that CCCF had possibly reverted back to a memorandum system of care, the Court finds that the opinion of Rahman—a former CMS official with years of experience at CCCF—could be afforded weight by a jury. On account of the substantial importance likely to be afforded Rahman's proffered testimony, the Court finds that Rahman's deposition creates a genuine issue as to whether, rather than an accredited sick call system, CCCF had reverted back to the outmoded "memorandum system" of inmate health care.

This finding is bolstered by the fact that Mr. Penn's memo was generated at all. The parties strenuously debate whether the memo is relevant. However, there is no evidence in record before the Court as to *why* this memo was generated. To the contrary, Penn simply stated in his deposition that he interviewed Andrews, noticed that he had flu-like symptoms, and accordingly attempted to communicate with CCCF medical staff about the problem. (Penn. Dep. at 11:16–18, 17:8–11, Pl.Ex. E.) In the deposition excerpt before the Court, Mr. Penn is not asked why he submitted this memo, nor was he asked whether it was his regular practice to do so. Thus, it appears to be an open issue whether, when writing the memo in question, Mr. Penn was acting on an impulse, out of altruistic concern, or was instead acting in accord with an unwritten policy in which the daily sick call had been abolished, contrary to the contract and to accreditation standards. The Court finds that a reasonable jury could find that— when considered in combination with the absence of a CCCF Medical Director—the generation of this memo tends to show that the discredited memorandum system was the *de facto* system of health care delivery at CCCF at the time Andrews was incarcerated, in disregard of the daily sick call policy for segregated inmates.

Plaintiff also has adduced evidence that, if such a memorandum system was in use, such a system posed a significant danger to inmates' access to adequate health care. A memorandum system necessarily involves corrections staff, because the memos are written by staff members and directed to medical personnel. Warden Owens has agreed with plaintiff's counsel that involving prison staff in inmate health care would "violate ACA and [NCCHC] standards". (Owens Dep. at 145:11–15.) Moreover, plaintiff's expert Joseph Rowan, MSW, FACFE, an author-

ity in the field of prison health services, is prepared to testify that under AMA and NCCHC guidelines a memorandum system would be unacceptable. (Rowan Rept. at pt. III.)

Based on the foregoing, the Court finds that plaintiff has come forward with evidence tending to show that CCCF's lack of a Medical Director and abandonment of the daily sick call system created an unreasonable risk that inmates would be deprived of their right to constitutionally adequate health care.

### b. Prong Two: Whether Defendants May Have Been Aware that the Unreasonable Risk Existed

The second prong in the *Sample* test is that plaintiff must adduce evidence that the defendants were aware of the unreasonable risk posed by CCCF's lack of a medical director. The Court finds that plaintiff also has satisfied this burden.

It is clear from the record before the Court that not having a Medical Director in place and abandoning daily sick call to segregated inmates is violative of both the terms of the CMSCamden County contract, and contrary to the accreditation standards of the American Medical Association (AMA) and the National Commission On Correctional Health Care (NCCHC). Under the terms of the CMS–Camden County contract, CMS agreed to have its services meet the 1992 standards developed by NCCHC. (CMSCamden County Contract, Art. III, Pl.Ex. L.) As originally developed by the AMA, NCCHC standards provide that reasonable health care must be provided to inmates, and that health care decisions must be made by a responsible physician in all instances. A reasonable jury may conclude that the daily sick call procedure was integral to the minimally required system, administered by the Medical Director. This responsible physician must make final medical judgments regarding the care provided inmates at a specific facility. (NCCHC *Standards for Health Services in Jails*, J–01. Respon-

sible Health Authority (essential), Appended to Pl.Ex. J.) Based on both the contract between CMS and Camden, and relevant accreditation authority, the Court finds that by pointing to the CMS–Camden contract's emphasis on the importance of the Medical Director position to the health maintenance of the facility, and by establishing that an accepted accrediting agency such as the NCCHC mandates that a physician be on staff at prisons in order to make health carerelated decisions, plaintiff has come forward with evidence from which a jury could conclude that defendants were aware of the importance of the Medical Director position, and accordingly were on notice of the risk posed by not having such a director on staff.

### c. Prong Three: Whether a Reasonable Jury Could Find that Defendants Were Deliberately Indifferent to the Risk

The Court finds that knowledge that there was no Medical Director on staff at CCCF can directly imputed to CMS. CMS was the direct employer of all health care providers at CCCF, and if in fact it was not employing a Medical Director then its records will so reflect. Likewise, knowledge of the risks associated with not having a Medical Director on staff can be imputed to Warden Owens, as he has clearly stated his understanding of the importance of the position to the effective functioning of CMS's services at CCCF. As reflected in Warden Owens' deposition testimony and the report of plaintiff's expert Joseph Rowan, both CMS and Camden County had an on-going duty to monitor the functioning of CCCF health care services. A reasonable factfinder could conclude that the failure to have in place essential personnel such as a Medical Director and a daily sick call system for segregated inmates goes beyond mere neglect and enters into the realm of reckless disregard of a known risk of harm. Warden Owens' proffered lack of awareness that his facility had no Medical Director at

the time also bespeaks marked indifference to the duty to provide constitutionally minimal care, if proved at trial. Accordingly, the Court finds that if at trial plaintiff is able to establish that there was in fact no Medical Director on staff at CCCF, and that the daily sick call system had been abandoned, then a jury could find that defendants were deliberately indifferent to this policy failure.

### d. *Prong Four: Whether a Reasonable Factfinder Could Find that the Failure to Provide Adequate Medical Treatment Resulted from the Failure to Employ the Identified Practice or Procedure*

The final prong of the *Sample* test is that plaintiff must show that the failure of CMS and the County to provide medical services is directly related to the failure to have in place the proffered policy or practice. Plaintiff has come forward with abundant evidence that his injuries are attributable to the inadequate care he received while at CCCF. According to plaintiff's expert Dr. Steven Nagelberg, M.D., F.A.C.E., an Endocrinologist, a review of Andrews' account of his incarceration make it "clear that Mr. Andrews did not receive proper care in prison." (Nagelberg Ltr. Dated February 21, 1999 at 2, Pl.Ex. M.) Dr. Nagelberg posits that Andrews "developed a critical illness as a direct result of the prison's failure to provide proper medical care", and concludes "to a medical degree of certainty, that Mr. Andrews would not have developed severe diabetes at this age if he had received proper medical care in prison." (*Id.*)

Dr. Nagelberg's opinion is mirrored by that of another of plaintiff's experts, Dr. Michael L. Silverman, M.D., an Infectious Disease Specialist, who states that the events surrounding Andrews' illness compel a finding that plaintiff's severe injuries "would have been averted had appropriate medical care been instituted when the complaints of tooth pain were evaluated and appropriately managed while he was

in prison." (Silverman Ltr. Dated February 15, 1999, Pl.Ex. N at 2.)

In opposition to plaintiff's experts' reports, defense expert Dr. Seth Braunstein reports that, in his opinion, there was no deviation from the standard of care in Andrews' treatment. (Braunstein Rept., CMS Ex. D.) These conflicting reports offer opposing views of the same set of facts and create a genuine issue as to which interpretation is proper, and as to whether plaintiff's injuries were caused by the policy, practice or custom that plaintiff has identified as creating an unreasonable risk of harm. Again, a reasonable jury could find that they were.

Based on the foregoing, the Court holds that plaintiff has created a genuine issue as to whether the Camden County defendants and CMS were deliberately indifferent to an unreasonable risk created by their failure to have in place a CCCF Medical Director. Accordingly, the Court will deny defendants' motion for summary judgment against plaintiff's § 1983 claims.

### D. *Camden County's Motion for Judgment Against Plaintiff's Claims Against Sheriff McLaughlin and Warden Owens*

The Court next considers the County's argument that both Warden Owens and Sheriff McLaughlin should be dismissed from the case.

First, County argues that plaintiff has adduced no evidence whatsoever that Camden County Sheriff McLaughlin had any knowledge or control over the operations or policies of CCCF. The Court agrees, and plaintiff has conceded this point. (Pl. Br. in Resp. to Camden County's Mot. at 29.) Consequently, summary judgment will be granted against plaintiff's claims against Sheriff McLaughlin, and all claims against Sheriff McLaughlin will be dismissed.

Second, Camden County argues that judgment should be granted against plaintiff's claims against Warden Owens be-

cause there has been no showing that Warden Owens actually knew of a custom or practice that created an unreasonable risk of harm. The Court finds that, based on the analysis of plaintiff's deliberate indifference claims, there is a genuine issue as to whether Warden Owens was deliberately or recklessly indifferent to the lack of a Medical Director at CCCF and the substandard procedures for receiving and addressing inmates' serious medical complaints. Accordingly, the Court will not enter judgment against claims against Owens on grounds of insufficiency of evidence.

Third, Camden County also has asserted that, even if it can be shown that he should have known of the risks present at CCCF at the time Andrews was incarcerated, Owens is immune to suit under § 1983 pursuant to the doctrine of qualified immunity and should not be made to stand trial. This argument is unavailing.

 Under the doctrine of qualified immunity, government officials are immune not only from trial, but from suit altogether. *See e.g., Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). When material facts are not in dispute, the district court may decide whether a government official has established the defense of qualified immunity as a matter of law. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

 Here, in analyzing plaintiff's argument, the Court must determine whether plaintiff has adduced evidence from which a juror could find that Warden Owens' conduct violated clearly established law. This test is an objective one, and "governmental officials performing discretionary functions generally are shielded from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Har-*

*low,* 457 U.S. at 817–18, 102 S.Ct. 2727. Under this standard, a defense of qualified immunity is not rebutted by evidence showing only that the defendant's conduct was malicious or improperly motivated, nor do bare allegations of malice establish a constitutional claim. *Crawford–El v. Britton,* 523 U.S. 574, 588, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998).

 In support of his argument that Owens should not be qualifiedly immune, plaintiff has come forward with evidence showing that CCCF had no Medical Director on staff, and that this lack of definitive medical authority in the facility may have led to the re-emergence of the discredited "memorandum" system of medical notification and abandonment of the daily sick call for segregated inmates. He also has shown that, by Owens' own admission, *both* CMS and CCCF had a responsibility to care for the safety and well being of the inmates. (Owens Dep. at 146:13–20.) Moreover, Owens stated that the Medical Director position was an important part of the CCCF medical system, and he would consult with the Medical Director whenever he needed a medical opinion. (Owens Dep. at 49:10–12.)

The Court finds that a reasonable person in Warden Owens' position should have known of the well-established obligation to provide constitutionally adequate health care to prisoners incarcerated at CCCF. Moreover, the Court finds that a reasonable person in Warden Owens' position would have known of the risks involved if CCCF was operated without a Medical Director, and without the opportunity for daily sick call for segregated inmates. Finally, the Court finds that Warden Owens' admission that he occasionally would consult with the Medical Director could lead a reasonable jury to conclude that Owens was reckless in his disregard for CCCF's lack of a Medical Director during Andrews' incarceration. In summary, this Court cannot conclude as a matter of law, if plaintiff's evidence is accepted by the jury, that a reasonable warden in Owens'

position, in the circumstances of this case, would have believed his conduct was reasonable in failing to act to elevate the level of medical care for the prisoners in his jail up to an acceptable level, as required by the Eighth Amendment. A rational jury could easily find that Warden Owens could not reasonably believe that the policies for delivering inmate medical services did not violate the Eighth Amendment in the circumstances of this case.

Accordingly, the Court holds that plaintiff has created a genuine issue as to whether Owens was deliberately indifferent to a condition which a reasonable person would recognize as creating an unreasonable risk that CCCF prisoners would be deprived of their Eighth Amendment right to adequate healthcare due to lack of medical supervision and accountability. Because plaintiff has made such a showing, Owens is not entitled to summary judgment on grounds of qualified immunity.

### CONCLUSION

For the reasons discussed above, the Court will deny defendant CMS's motion for summary judgment, and will deny defendant Camden County's motion for summary judgment except to the extent that it seeks dismissal of plaintiff's claims against Sheriff McLaughlin. The accompanying Order is entered.

### ORDER

THIS MATTER having come before the Court motion of defendants CMS and Camden County for summary judgment pursuant to Rule 56, Fed.R.Civ.P., and the Court having considered the submissions of the parties;

**IT IS** this day of March, 2000 **ORDERED** as follows:

1. Defendant CMS's motion for summary judgment against Counts I & III of plaintiff's amended complaint (Docket entry No. 37) hereby is **DENIED**; and

2. Defendant Camden County's motion for summary judgment against Counts I & III of plaintiff's amended complaint (Docket entry No. 33) hereby is **DENIED** except to the extent that it seeks judgment against claims against Sheriff McLaughlin, as to which defendant McLaughlin's motion is **GRANTED**; and plaintiff's claims against defendant McLaughlin hereby are **DISMISSED**.